**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MM PRODUCTION ENTERPRISES, LLC, a Florida limited liability company d/b/a SOLUTION PEPTIDES<br><br>and<br><br>MICHAEL SKARZYNSKI,<br><br>Plaintiffs,<br><br>vs.<br><br>AVIDIA BANK, a mutual community bank,<br><br>Defendant. | Civil Action No. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs MM Production Enterprises, LLC ("MM Production") and Michael Skarzynski ("Skarzynski") (collectively, "Plaintiffs"), by and through undersigned counsel, file this Complaint against Defendant Avidia Bank ("Avidia" or "Defendant") and allege as follows:

## I. INTRODUCTION

1. This action arises from Avidia's systematic failure to perform the very responsibilities it expressly undertook as part of the terms and conditions incorporated in its Merchant Application/Agreement (hereinafter, the "MPA") with MM Production and its Personal Guaranty with Skarzynski, both of which were integral to Avidia's decision to serve as MM Production's sponsoring Mastercard member bank.

2. Avidia approved MM Production to participate in the Mastercard payment network, expressly agreed to educate Plaintiffs regarding the pertinent Mastercard operating regulations

governing their business, failed to provide that education, terminated MM Production's merchant account based upon alleged violations of those same operating regulations, caused Plaintiffs to be placed on Mastercard's MATCH system, and then required Plaintiffs to reimburse Avidia for the resulting Mastercard Brand Reputation and Compliance (hereinafter, the "BRAM") assessment.

3. Avidia's contractual obligations began long before it terminated MM Production's account. As a sponsoring member bank, Avidia possessed the exclusive authority to underwrite merchants for participation in the Mastercard payment network and expressly represented that it would educate Plaintiffs regarding the pertinent Mastercard Operating Regulations with which Plaintiffs were required to comply. Those reciprocal obligations were fundamental to the Parties' relationship. Plaintiffs could not reasonably comply with Mastercard's complex operating standards without relying upon the expertise and guidance of the very institution that approved its participation in the payment system.

4. Upon information and belief, Avidia regularly sponsors independent sales organizations that specialize in high-risk merchants and routinely underwrites merchants engaged in industries subject to heightened scrutiny under Mastercard's standards, including merchants engaged in the sale of research-use-only (hereinafter, "RUO") peptides and similar products. Avidia therefore possessed, or in the exercise of reasonable diligence should have possessed, substantial knowledge regarding the Mastercard standards applicable to Plaintiffs' business before approving Plaintiffs' merchant account.

5. Upon information and belief, one or more of the following is true: (a) Avidia knowingly approved Plaintiffs' merchant account despite understanding that Plaintiffs' business allegedly implicated Mastercard standards that Avidia now contends prohibited or restricted Plaintiffs' activities; (b) Mastercard materially modified or clarified the applicable standards after Plaintiffs' account was approved, and Avidia failed to educate Plaintiffs regarding those changes despite its continuing

contractual obligation to do so; or (c) both. Under any of those scenarios, Avidia breached its contractual obligations to Plaintiffs.

6. Rather than fulfilling its contractual duties, Avidia remained silent. It never educated Plaintiffs regarding the Mastercard standards that it now claims Plaintiffs violated, never instructed Plaintiffs to modify their business practices, never advised Plaintiffs that their products or operations allegedly created compliance concerns, and never afforded Plaintiffs an opportunity to address any purported deficiencies before terminating the Parties' relationship.

7. Having failed to perform its own contractual obligations, Avidia thereafter relied upon the very circumstances its own breach created to terminate MM Production's merchant account, report Plaintiffs to Mastercard's MATCH system, and impose upon Plaintiffs the financial consequences of that reporting, including a BRAM assessment. Avidia used the contract to shift to Plaintiffs losses that were proximately caused by Avidia's own contractual breaches.

8. This action seeks to hold Avidia accountable for those breaches, recover the damages they caused, including the improperly assessed BRAM fine, obtain declaratory relief concerning the Parties' rights and obligations under the MPA and Personal Guaranty, and restore Plaintiffs to the position they would have occupied had Avidia performed the obligations it expressly undertook.

## II. PARTIES

9. MM Production is a Florida limited liability company organized and existing under the laws of the State of Florida. MM Production's sole member is Skarzynski.

10. Skarzynski is a natural person and citizen of the State of Florida. MM Production is therefore a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

11. Avidia is a Massachusetts-chartered banking institution with its principal place of business in Hudson, Massachusetts. Avidia is a citizen of Massachusetts for purposes of 28 U.S.C. §§ 1332 and 1348.

## III. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a). The value of the object of the litigation exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states. MM Production is a citizen of Florida because its sole member, Skarzynski, is a citizen of Florida. Avidia is a citizen of Massachusetts.

13. As a condition of obtaining the merchant account that is the subject of this action, Avidia required Skarzynski to execute a written Personal Guaranty (the "Personal Guaranty") in his individual capacity. The Personal Guaranty incorporated the terms and conditions of the MPA which Skarzynski signed on behalf of MM Production.

14. Pursuant to the Personal Guaranty, Skarzynski agreed to guarantee the obligations arising under the written MPA between MM Production and Avidia. In exchange, Avidia expressly agreed that "(i) the personal jurisdiction and exclusive venue of any claim shall lie in the federal or state courts of Cuyahoga County, Ohio, (ii) any Arbitration shall exclusively and solely be held in Cleveland, Ohio, and (iii) all objections to said jurisdiction are hereby waived."

15. Plaintiffs bring this action, in part, pursuant to that forum-selection provision. By drafting and requiring execution of the Personal Guaranty, Avidia expressly consented to personal jurisdiction and venue in this Court with respect to claims brought by Skarzynski arising out of or relating to the MPA and the Personal Guaranty.

16. The claims asserted by MM Production arise out of the same integrated contractual relationship, the same operative facts, the same merchant account, the same termination, the same MATCH reporting, and the same BRAM assessment as the claims asserted by Skarzynski. Judicial economy, the avoidance of inconsistent judgments, and the interests of justice therefore favor adjudicating all claims in a single proceeding.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant contractually agreed that exclusive venue for claims arising under the Personal Guaranty lies in the federal or state courts located in Cuyahoga County, Ohio.

## IV. BACKGROUND OF THE PAYMENT CARD INDUSTRY

18. Visa and Mastercard (hereinafter, the "Card Brands") are global payment card networks that establish the rules, regulations, and operating standards governing the acceptance and processing of payment card transactions. Merchants cannot access those payment networks directly. Instead, merchants must obtain sponsorship from a financial institution that is authorized by the applicable card brand to participate as an acquiring member.

19. An acquiring member bank (hereinafter, the "Acquirer") serves as the merchant's gateway into the payment card system. Before a merchant may begin accepting payment cards, the Acquirer must evaluate, approve, and underwrite the merchant in accordance with the applicable Card-Brand standards. Only after the Acquirer approves the merchant may the merchant participate in the payment network.

20. Because the Acquirer serves as the merchant's sponsor within the payment card system, the Acquirer bears significant responsibilities under the Card Brand operating rules (hereinafter, the "Card Brand Rules"). These responsibilities include underwriting merchants before approving them for participation in the payment network, monitoring merchants for continued compliance with applicable Card Brand Rules, and educating merchants regarding the pertinent operating rules governing their businesses.

21. Merchants necessarily rely upon their Acquirers to perform those responsibilities. Unlike Acquirers, merchants generally do not have direct access to the Card Brands' internal underwriting processes, risk analyses, or compliance determinations. Rather, merchants reasonably

rely upon their Acquirers to determine whether the merchants qualify to participate in the payment network and to advise them regarding the operating standards with which they must comply.

22. To facilitate merchant acquisition and servicing, Acquirers frequently contract with independent sales organizations (hereinafter, the "ISO") to market merchant accounts and provide customer-facing support. This delegation by the Acquirer is allowed by the Card Brand Rules. The ISO acts on behalf of the Acquirer in soliciting merchants, processing applications, and assisting with account servicing. The Acquirer however remains responsible for sponsoring, underwriting, and approving merchants for participation in the payment network and for complying with the obligations imposed upon it by the Card Brands.

23. Mastercard maintains the "Member Alert to Control High-Risk Merchants" (hereinafter, the "MATCH") system, a database used by Acquirer's to identify merchants whose prior acquiring relationships have been terminated for certain specified reasons recognized under the Card Brand Rules. A merchant placed on the MATCH system is often unable to obtain another merchant account, effectively excluding the merchant from participating in the Card Brand payment network.

24. Mastercard also administers the BRAM program, through which Acquirers may be assessed substantial monetary fines for failing to detect, deter, and prevent certain merchant activities that Mastercard determines violate its standards. Those assessments are imposed upon the Acquirer, which then seeks to pass the assessment through to the merchant pursuant to the parties' MPA.

25. Because an Acquirer controls merchant onboarding, underwriting, compliance oversight, termination, MATCH reporting, and the assessment of Card Brand liabilities, merchants necessarily rely upon the Acquirer to exercise those responsibilities competently, in good faith, and in accordance with both the parties' agreement and the applicable Card Brand Standards.

26. Consistent with Mastercard's allocation of responsibilities, as MM Production's Acquirer, Avidia expressly undertook numerous contractual obligations in connection with MM

Production's participation in the Card Brand payment network, including obligations relating to underwriting, merchant education, account administration, termination, and the allocation of liability for Mastercard assessments. Those contractual obligations are discussed below.

## V. THE PARTIES' CONTRACTUAL RELATIONSHIP

27. Plaintiffs sought to establish a merchant account through which MM Production could lawfully accept payment cards from its customers in connection with its business operations.

28. To obtain access to the Card Brand payment networks, Plaintiffs submitted an MPA and Personal Guaranty to Avidia. As part of that application process, Plaintiffs disclosed information concerning their business operations and the products they intended to market and sell.

29. Avidia accepted Plaintiffs application and agreed to sponsor MM Production's participation in the Mastercard payment network by establishing a merchant account through which MM Production could accept and process payment card transactions.

30. As a condition of approving MM Production's merchant account, Avidia required Skarzynski to execute the Personal Guaranty in his individual capacity.

31. The MPA, Personal Guaranty, and the Terms and Conditions incorporated therein, was executed as components of a single integrated transaction and collectively govern the parties' respective rights and obligations with respect to the establishment, operation, administration, and termination of MM Production's merchant account. A copy of the MPA, Personal Guaranty, and incorporated Terms and Conditions are attached as **Exhibit A**.

32. Pursuant to the MPA, Avidia agreed to sponsor MM Production's participation in the Card Brand payment network and to provide merchant acquiring services in accordance with the terms and conditions of the MPA.

33. As the Acquirer, Avidia possessed exclusive authority to determine whether Plaintiffs qualified to participate in the Card Brand payment network, whether Plaintiffs would be approved for

processing services, whether Plaintiffs remained eligible to continue participating in the payment system, and whether circumstances existed that warranted termination of the parties' relationship or reporting of Plaintiffs to the Card Brands.

34. The MPA imposed obligations upon both Plaintiffs and Avidia. Plaintiffs agreed to comply with the applicable Card Brand Rules governing MM Production's merchant account. In turn, Avidia expressly undertook numerous obligations relating to the underwriting, education, administration, monitoring, termination, and servicing of MM Production's merchant account.

35. At all times material hereto, Plaintiffs performed, or was excused from performing, each of its material obligations under the MPA except to the extent performance was prevented, hindered, or rendered impossible by Avidia's prior material breaches of the MPA.

## VI. AVIDIA'S EXPRESS CONTRACTUAL OBLIGATIONS

### A. Avidia Expressly Agreed to Educate Plaintiffs Regarding the Card Brand Operating Regulations Governing Their Business.

36. As part of the MPA executed by the Parties, Avidia expressly acknowledged and agreed that, as the Acquirer, it was responsible for educating Plaintiffs regarding the pertinent Card Brand Operating Regulations with which Plaintiffs were required to comply. E.g., Ex. A, p. 1, ¶ 3.

37. That obligation existed because MM Production could not participate directly in the Card Brand payment network. Rather, MM Production was required to participate through Avidia, which possessed superior knowledge concerning the Card Brand Rules applicable to merchants operating within Plaintiffs' line of business.

38. The MPA therefore imposed reciprocal obligations. Plaintiffs agreed to comply with the applicable Card Brand Rules, while Avidia expressly agreed to educate Plaintiffs regarding the pertinent Card Brand Rules necessary to enable such compliance.

39. The obligation to educate Plaintiffs was a continuing obligation that existed throughout the Parties' contractual relationship. It necessarily included advising Plaintiffs of pertinent Card Brand Operating Regulations applicable to their business and, upon information and belief, material changes thereto that affected Plaintiffs' continued eligibility to participate in the Card Brand payment network.

### B. Avidia Expressly Undertook the Responsibility of Determining Whether MM Production Qualified to Participate in the Card Brand Payment Network.

40. Avidia possessed the exclusive authority and responsibility to determine whether MM Production qualified to participate in the Card Brand payment network before approving Plaintiffs' MPA.

41. Upon information and belief, Avidia sponsors numerous ISOs that specialize in high-risk merchant accounts, including, without limitation, Maverick BankCard, Inc. and Transmodus Corp. d/b/a PayCosmos.

42. Upon information and belief, Avidia likewise underwrites and maintains merchant accounts for numerous merchants engaged in the sale of RUO peptides and other products that are apparently subject to heightened scrutiny under the Card Brand Rules. As a result, Avidia was familiar with, or in the exercise of reasonable diligence should have been familiar with, the Card Brand Rules applicable to merchants engaged in MM Production's line of business.

43. By approving Plaintiffs' MPA and establishing MM Production's merchant account, Avidia necessarily determined that MM Production qualified to participate in the Card Brand payment network subject to the terms of the parties' MPA.

44. Upon information and belief, one or more of the following is true:

a. Avidia knowingly approved MM Production's merchant account despite understanding that Plaintiffs' business allegedly implicated Card Brand Rules that Avidia now contends prohibited or restricted MM Production's activities;

b. after underwriting Plaintiffs, Mastercard materially modified or clarified the applicable Card Brand Rules, and Avidia failed to educate Plaintiffs regarding those changes despite its continuing contractual obligation to do so; or

c. both.

45. Under any of those circumstances, Avidia assumed contractual obligations that it subsequently failed to perform.

**C. The MPA Authorized Avidia To Terminate The Merchant Account Only Upon The Existence Of A Contractually Authorized Reason.**

46. Section 18 of the MPA authorizes Avidia to terminate or suspend the MPA for any breach by Plaintiffs or for other reasons identified in, or contemplated by, the MPA.

47. The MPA further identifies numerous examples of circumstances that may justify termination, including circumstances relating to changes in Plaintiffs' business, financial condition, chargeback activity, security concerns, risk exposure, or where the Card Brand Rules require termination.

48. The MPA did not authorize Avidia to terminate the Parties' contractual relationship based upon circumstances materially caused by Avidia's own prior breach of the MPA.

49. Accordingly, Avidia could not rely upon conditions created, contributed to, or materially caused by its own failure to perform its contractual obligations as justification for terminating MM Production's merchant account.

**D. The MPA Limited Plaintiffs' Obligation To Indemnify Avidia For Mastercard Assessments.**

50. Section 19 of the MPA obligates Plaintiffs to indemnify Avidia for certain fines, assessments, fees, losses, liabilities, damages, and expenses arising from specifically identified circumstances, including, among other things, Plaintiffs' breach of the MPA, violation of applicable

law or the Card Brand Rules, negligence, misconduct, or other conduct expressly identified in the MPA.

51. The MPA does not require Plaintiffs to indemnify Avidia for assessments arising from Avidia's own breaches of the MPA or from circumstances materially caused by Avidia's failure to perform its contractual obligations.

52. Accordingly, Avidia was not contractually entitled to require Plaintiffs to reimburse Mastercard assessments that arose because of Avidia's own conduct, including Avidia's failure to educate Plaintiffs regarding the pertinent Card Brand Operating Regulations applicable to Plaintiffs' business.

## VII. PLAINTIFF'S BUSINESS

53. Plaintiffs are engaged in the lawful sale of RUO peptides and related products through their online business.

54. At all times material hereto, MM Production marketed and sold its products exclusively for research purposes and expressly represented that its products were not intended for human consumption, therapeutic use, diagnostic use, or any other use prohibited by applicable law.

55. Plaintiffs conducted their business through publicly accessible websites and online sales platforms that accurately described the products offered for sale, the intended RUO nature of those products, and the terms and conditions governing their purchase.

56. Before approving Plaintiffs' MPA, Avidia was afforded the opportunity, and in fact was required by Mastercard, to investigate Plaintiff's business operations, review MM Production's websites, evaluate the products offered for sale, and determine whether MM Production qualified to participate in the Card Brand payment network.

57. Upon information and belief, Avidia performed such underwriting investigation as it deemed appropriate before approving Plaintiffs' MPA and establishing MM Production's merchant account.

58. At no time during the Parties' relationship did Plaintiffs materially alter the type of business identified in their MPA. MM Production continued to sell the same categories of RUO products that were disclosed to and approved by Avidia during the underwriting process.

59. At no time before approving MM Production's merchant account did Avidia advise Plaintiffs that their business model, products, marketing, or sales practices rendered them ineligible to participate in the Card Brand payment network.

60. Likewise, at no time after approving MM Production's merchant account did Avidia advise Plaintiffs that their continued business operations allegedly violated the Card Brand Rules, instruct MM Production to modify their business practices, identify any Card Brand Operating Regulation that Avidia believed MM Production was violating, or otherwise provide the education that Avidia expressly agreed to provide under the MPA.

61. Instead, Avidia approved MM Production's participation in the Card Brand payment network, permitted MM Production to process payment card transactions, and continued that relationship until ultimately terminating the merchant account and causing Plaintiffs to be placed on the MATCH.

## VIII. <u>AVIDIA NEVER EDUCATED PLAINTIFF REGARDING THE PERTINENT CARD BRAND OPERATING REGULATIONS</u>

62. Notwithstanding its express contractual obligation to educate Plaintiffs regarding the pertinent Card Brand Operating Regulations applicable to MM Production's business, Avidia never provided Plaintiffs with any meaningful education concerning those regulations.

63. At no time before approving Plaintiffs' MPA did Avidia identify any Card Brand Rule that prohibited or restricted MM Production's business model, products, marketing practices, or payment processing activities.

64. Likewise, at no time after approving MM Production's merchant account did Avidia advise Plaintiffs that their business operations allegedly violated, or risked violating, any Card Brand Rules.

65. Avidia never advised Plaintiffs that the sale of RUO peptides, as conducted by MM Production, allegedly implicated Card Brand Rules that could result in the termination of MM Production's merchant account, place Plaintiffs on the MATCH system, or the assessment of BRAM fines against Avidia.

66. Avidia likewise never instructed MM Production to modify its products, marketing practices, website content, transaction processing activities, or other business operations in order to comply with any Card Brand Rules.

67. If Avidia determined before approving MM Production's MPA that MM Production's business model was inconsistent with the Card Brand Rules, Avidia nevertheless approved MM Production's merchant account without disclosing those concerns or educating Plaintiffs regarding the applicable rules.

68. Alternatively, if the Card Brand Rules applicable to MM Production's business materially changed after Avidia approved MM Production's merchant account, Avidia failed to educate Plaintiffs regarding those changes despite its continuing contractual obligation to do so.

69. Had Avidia fulfilled its contractual obligation to educate Plaintiffs regarding the pertinent Card Brand Rules, Plaintiffs could and would have modified their business practices, discontinued accepting payment cards, sought clarification from Avidia, or otherwise taken reasonable

steps to maintain compliance with the Card Brand Rules and avoid termination of its merchant account, placement on the MATCH, and the assessment of BRAM fines.

70. Instead, Avidia remained silent, permitted MM Production to continue processing transactions, and ultimately relied upon the very circumstances its own failure to educate created as justification for terminating MM Production's merchant account, causing Plaintiffs to be placed on the MATCH system, and seeking reimbursement of the resulting BRAM assessment.

## IX. <u>TERMINATION</u>

71. On or about October 7, 2024, Avidia notified MM Production that it was terminating the MPA and MM Production's merchant account.

72. Avidia terminated MM Production's merchant account notwithstanding the fact that MM Production continued to operate the same business that Avidia had previously approved during the underwriting process.

73. Before terminating the merchant account, Avidia did not identify any material change in MM Production's business operations, products, marketing practices, or transaction processing activities from those disclosed during the underwriting process.

74. Nor did Avidia identify any specific Card Brand Rules that Plaintiffs allegedly violated or explain how MM Production's business had become ineligible to participate in the Mastercard payment network.

75. At no time before (or after) terminating the MPA did Avidia notify MM Production that its continued participation in the Card Brand payment network allegedly posed an unacceptable operational, reputational, financial, technological, security, fraud, or other risk, nor did Avidia provide MM Production with an opportunity to address or cure any alleged compliance deficiency.

76. Upon information and belief, Avidia terminated MM Production's merchant account based upon its determination that Plaintiffs' business allegedly violated one or more Card Brand Rules

or that continued processing presented an unacceptable level of risk, however, Avidia has not been able to provide an explanation as to the basis for the perception of unacceptable risk, a fact that persists to the present day.

77. If Avidia believed that MM Production's business violated the Card Brand Rules at the time it approved Plaintiffs' MPA, Avidia nevertheless elected to establish and maintain MM Production's merchant account without educating MM Production regarding the standards that Avidia now contends justified termination.

78. Alternatively, if Avidia believed that MM Production's business became noncompliant because of subsequent changes to the Card Brand Rules or their interpretation, Avidia failed to educate MM Production regarding those changes before terminating the MPA.

79. On or about October 11, 2024, after terminating MM Production's merchant account, Avidia caused, recommended, supported, or otherwise facilitated Plaintiffs' placement on MATCH.

80. Avidia's recommendation or support for Plaintiffs' placement on MATCH was based upon the same conduct that formed the basis for its October 7, 2024 termination of the MPA.

81. As a direct and proximate result of Avidia's termination of the MPA and the resulting MATCH, MM Production was unable to continue accepting payment cards, suffered substantial business interruption, and incurred significant financial damages.

## X. <u>THE BRAM ASSESSMENT</u>

82. Following MM Production's termination and placement on the MATCH, Mastercard assessed Avidia a $114,375 BRAM fine based upon Avidia's alleged failure, as the acquiring member bank and Mastercard member, to detect, deter, and prevent merchant activity that Mastercard concluded violated the Card Brand Rules.

83. Thereafter, Avidia demanded that Plaintiffs reimburse Avidia for the BRAM assessment pursuant to the indemnification provisions contained in the MPA.

84. In reliance upon Avidia's demand and its interpretation of the MPA, Plaintiffs reimbursed Avidia for the BRAM assessment.

85. At all times material hereto, Plaintiffs disputed that they were contractually responsible for the BRAM assessment and maintained that Avidia's own conduct, including its failure to educate Plaintiffs regarding the pertinent Card Band Rules materially contributed to or caused the circumstances giving rise to the assessment.

86. Upon information and belief, the BRAM assessment arose from the same alleged conduct that Avidia relied upon in terminating MM Production's merchant account and causing or supporting Plaintiffs' placement on the MATCH.

87. But for Avidia's breaches of the MPA, including its failure to perform its express contractual obligation to educate Plaintiffs regarding the pertinent Card Brand Rules, the BRAM assessment would not have been imposed, and Plaintiffs would not have incurred the damages associated therewith.

88. As a direct and proximate result of Avidia's conduct, Plaintiffs sustained damages including, without limitation, the amount of the BRAM assessment, the loss of their merchant processing relationship, the loss of their ability to accept payment cards, business interruption damages, lost profits, and other consequential damages in an amount to be proven at trial.

## XI. <u>THE MATCH PLACEMENT'S EFFECT ON SKARZYNSKI</u>

89. As part of MM Production's placement on MATCH, Mastercard also identified Skarzynski as a principal associated with the reported merchant.

90. Under the Card Brand Rules, the MATCH system associates a reported principal with the merchant that has been placed on MATCH and identifies that individual to acquiring member banks evaluating future merchant account applications.

91. As a result of Avidia's recommendation, support, or facilitation of MM Production's placement on the MATCH system, Skarzynski has likewise been identified on the MATCH system as a principal associated with the reported merchant.

92. Upon information and belief, Acquirers routinely consult the MATCH system before approving new merchant accounts. A principal identified on the MATCH system is frequently unable to obtain approval for a new merchant account, either individually or through another business entity, absent extraordinary circumstances.

93. Upon information and belief, acquiring member banks routinely consult MATCH during the pendency of their agreements with existing merchant accounts. A principal identified on the MATCH system is frequently unable to maintain its existing merchant account relationships absent extraordinary circumstances.

94. A MATCH listing ordinarily remains associated with the reported merchant and its identified principals for a period of approximately five years unless earlier removed in accordance with Mastercard.

95. As a direct and proximate result of Avidia's actions, Skarzynski has been substantially impaired in his ability to establish, own, operate, or participate in any business requiring payment-processing services. The MATCH listing has therefore caused Skarzynski to suffer injuries separate and distinct from those suffered by MM Production.

96. Unless removed from the MATCH system, Skarzynski will continue to suffer ongoing harm to his business opportunities, commercial reputation, and ability to obtain and maintain merchant acquiring services for himself and for business entities with which he is affiliated.

## XII. DAMAGES

97. As a direct and proximate result of Avidia's breaches of the MPA and the conduct alleged herein, Plaintiffs have sustained, and will continue to sustain, substantial damages.

98. As a direct and proximate result of Avidia's wrongful conduct, MM Production has suffered damages including, without limitation:

a. the loss of its ability to accept payment card transactions;

b. the loss of its merchant processing relationship;

c. lost sales, lost profits, and other business interruption damages;

d. the BRAM assessment that Avidia improperly required MM Production to reimburse;

e. costs incurred in attempting to obtain replacement payment-processing services;

f. increased processing costs and other expenses associated with obtaining replacement processing, to the extent replacement processing could be obtained;

g. injury to MM Production's business reputation and goodwill; and

h. other compensatory and consequential damages in an amount to be proven at trial.

99. As a direct and proximate result of Avidia's wrongful conduct, Skarzynski has suffered damages including, without limitation:

a. impairment of his ability to establish, own, operate, or participate in businesses requiring merchant processing services;

b. impairment of his ability to maintain existing merchant processing relationships associated with businesses in which he has an ownership or management interest;

c. injury to his commercial reputation within the payment-processing industry;

d. lost business opportunities resulting from his continued identification on MATCH; and

e. other compensatory and consequential damages in an amount to be proven at trial.

100. The damages sustained by MM Production and Skarzynski were the natural, foreseeable, and direct result of Avidia's breaches of the MPA and Personal Guaranty and Avidia's failure to discharge the contractual obligations it expressly undertook as MM Production's Acquirer.

101. Unless otherwise stated herein, all conditions precedent to Plaintiffs' recovery have occurred, have been performed, or have been waived.

## CAUSES OF ACTION

### Count I – Breach of Contract

102. MM Production and Skarzynski reallege and incorporate by reference paragraphs 1 through 101 as though fully set forth herein.

103. The MPA, and its incorporated Personal Guaranty, constitutes a valid and enforceable contract.

104. Plaintiffs performed all material obligations required of them under the MPA or were excused from further performance by virtue of Avidia's prior material breaches.

105. The MPA imposed numerous express contractual obligations upon Avidia, including, without limitation, obligations relating to the underwriting of MM Production's merchant account, the education of Plaintiffs regarding the pertinent Card Brand Rules governing its business, the administration and termination of MM Production's merchant account, and the allocation of liability for Mastercard assessments.

106. The MPA likewise vested Avidia with substantial discretion in administering MM Production's merchant account, including discretion relating to underwriting, risk management, merchant monitoring, termination of the MPA, reporting merchants to Mastercard, and allocating liability for Mastercard assessments. Implicit in the MPA was the covenant that Avidia would exercise that discretion honestly, in good faith, and in a manner consistent with the purposes of the MPA and the parties' justified contractual expectations.

107. Avidia materially breached the MPA by failing to educate Plaintiffs regarding the pertinent Card Brand Rules applicable to MM Production's business, despite expressly agreeing that, as the sponsoring member bank, it was responsible for providing such education.

108. Upon information and belief, Avidia also materially breached the MPA by approving MM Production's merchant account despite knowing, or having reason to know, that MM Production's business allegedly implicated Mastercard standards that Avidia now contends prohibited or restricted MM Production's activities, while simultaneously failing to disclose those standards or educate Plaintiffs regarding them.

109. Alternatively, if the Mastercard standards applicable to MM Production's business materially changed after Avidia approved MM Production's merchant account, Avidia materially breached the MPA by failing to educate Plaintiffs regarding those changes despite its continuing contractual obligation to do so.

110. Avidia further materially breached the MPA by terminating MM Production's merchant account based upon circumstances materially caused by Avidia's own antecedent breaches of the MPA, including its failure to educate Plaintiffs regarding the pertinent Card Brand Rules governing Plaintiffs' business.

111. Avidia further materially breached the MPA by causing, recommending, supporting, or otherwise facilitating Plaintiffs' placement on Mastercard's MATCH system based upon the same circumstances materially caused by Avidia's prior breaches of the MPA.

112. Avidia further materially breached the MPA by exercising its contractual discretion in bad faith and inconsistently with the purposes of the MPA, including by:

a. approving MM Production's merchant account while failing to disclose or educate Plaintiffs regarding Mastercard standards that Avidia contended governed MM Production's business;
b. failing to advise Plaintiffs of material Mastercard standards or material changes thereto despite expressly undertaking that responsibility;

c. terminating the MPA based upon circumstances materially caused by Avidia's own antecedent breaches of the MPA;

d. causing, recommending, supporting, or otherwise facilitating Plaintiffs' placement on Mastercard's MATCH system based upon circumstances materially caused by Avidia's own conduct; and

e. invoking Section 19 of the MPA to require Plaintiffs to reimburse Avidia for a BRAM assessment that, upon information and belief, resulted in whole or in part from Avidia's own failures to perform its contractual and Mastercard-imposed responsibilities.

113. Avidia further materially breached the MPA by demanding and collecting reimbursement of the BRAM assessment pursuant to Section 19 of the MPA even though the contractual prerequisites for indemnification had not occurred.

114. Specifically, the BRAM assessment did not arise from an indemnifiable breach of the MPA by Plaintiffs. Rather, upon information and belief, the assessment resulted, in whole or in part, from Avidia's own failure, as the acquiring member bank, to satisfy its obligations under the Mastercard standards and from Avidia's antecedent breaches of the MPA.

115. Avidia was not contractually entitled to invoke the indemnification provisions of Section 19 to shift to Plaintiffs losses materially caused by Avidia's own breaches of the MPA.

116. To the extent Section 19 obligated Plaintiffs to indemnify Avidia for the BRAM assessment, Plaintiffs' payment of that assessment constitutes consequential damage directly resulting from Avidia's antecedent breach of its express obligation to educate Plaintiffs regarding the pertinent Card Brand Rules. Had Avidia performed that obligation, MM Production could and would have modified its conduct, discontinued Mastercard acceptance, or otherwise taken appropriate measures to avoid the conduct that allegedly resulted in the BRAM assessment. Accordingly, but for Avidia's breach, Plaintiffs would never have incurred the indemnification obligation upon which Avidia relies.

117. Each of the foregoing breaches independently and collectively deprived Plaintiffs of the benefits reasonably expected under the MPA, including the benefit of having Avidia exercise its contractual discretion fairly, honestly, and consistently with the purposes of the parties' contractual relationship.

118. As a direct and proximate result of Avidia's breaches, Plaintiffs have sustained damages including, without limitation, lost profits, business interruption damages, loss of merchant processing services, injury to business reputation and goodwill, impairment of existing and future merchant processing relationships, the amount of the improperly assessed BRAM fine, and other compensatory and consequential damages in amounts to be proven at trial.

**Count II – Declaratory Judgment (28 U.S.C. §§ 2201 and 2202)**

119. Plaintiffs reallege and incorporate by reference paragraphs 1 through 118 as though fully set forth herein.

120. An actual, present, and justiciable controversy exists between the parties concerning their respective rights and obligations under the MPA and Personal Guaranty.

121. Avidia contends that it properly exercised its contractual rights in terminating MM Production's merchant account, recommending or supporting Plaintiffs' placement on Mastercard's MATCH system, and requiring Plaintiffs to reimburse the BRAM assessment.

122. Plaintiffs contend that Avidia materially breached the MPA before terminating the parties' contractual relationship, including by failing to educate MM Production regarding the pertinent rules and regulations governing its business and by exercising the discretion afforded under the MPA in a manner inconsistent with the MPA and the parties' justified contractual expectations.

123. Plaintiffs further contend that Avidia was not contractually entitled to terminate the MPA based upon circumstances materially caused by Avidia's own antecedent breaches of the MPA.

124. Plaintiffs further contend that Avidia was not contractually entitled to invoke Section 19 of the MPA to require reimbursement of the BRAM assessment because the contractual prerequisites for indemnification never occurred.

125. Plaintiffs further contend that Avidia's recommendation, support, or facilitation of Plaintiffs' placement on Mastercard's MATCH system was improper because it was predicated upon circumstances materially caused by Avidia's own breaches of the MPA.

126. The parties dispute presents actual and substantial controversies regarding the interpretation of the MPA and the parties' continuing contractual rights and obligations. Those controversies are of sufficient immediacy and reality to warrant the issuance of declaratory relief.

127. Plaintiffs therefore seek declarations that:

a. Avidia materially breached the MPA before terminating MM Production's merchant account;

b. Avidia was not contractually entitled to terminate the MPA based upon circumstances materially caused by Avidia's own antecedent breaches of the MPA;

c. Avidia was not contractually entitled to invoke Section 19 of the MPA to require MM Production to reimburse the BRAM assessment;

d. MM Production was not contractually obligated to reimburse the BRAM assessment;

e. Avidia's recommendation, support, or facilitation of Plaintiffs' placement on Mastercard's MATCH system was inconsistent with the parties' contractual rights and obligations; and

f. Plaintiffs are entitled to such further relief as the Court determines is appropriate under the MPA and applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, MM Production Enterprises, LLC and Michal Skarzynski respectfully request that this Court enter judgment in their favor and against Avidia Bank and grant the following relief:

A. Award compensatory damages in an amount to be determined at trial;

B. Award consequential damages, including, without limitation, lost profits, business interruption damages, damage to business reputation and goodwill, and all other damages recoverable under Ohio law;

C. Award MM Production restitution of the BRAM assessment improperly collected by Avidia, together with interest thereon;

D. Enter a declaratory judgment determining the parties' respective rights and obligations under the MPA and Personal Guaranty, including declarations that:

   a. Avidia materially breached the MPA;

   b. Avidia was not contractually entitled to terminate MM Production's merchant account under the circumstances alleged herein;

   c. Avidia was not contractually entitled to invoke the indemnification provisions of the MPA to require MM Production to reimburse the BRAM assessment; and

   d. MM Production was not contractually obligated to reimburse the BRAM assessment;

   e. Avidia is obligated to take all reasonable and necessary steps to request, support, and cooperate in the removal of MM Production and Michal Skarzynski from the MATCH system.

E. Award pre-judgment interest as permitted by Ohio law;

F. Award post-judgment interest as permitted by 28 U.S.C. § 1961;

G. Tax the costs of this action against Avidia; and

H. Award such other and further legal or equitable relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, MM Production Enterprises, LLC and Michal Skarzynski hereby demand a trial by jury on all issues so triable.

Dated: October 6, 2026

Respectfully submitted,

/s/ Justin L. Knappick
Justin L. Knappick
Dressman Benzinger LaVelle psc
109 East Fourth Street
Covington, KY 41011
Phone: (859) 426-2126
Fax: (859) 788-2011
jknappick@dbllaw.com
Attorney for Plaintiff,
MM PRODUCTION ENTERPRISES, LLC

national processing

MERCHANT APPLICATION / AGREEMENT

| *Office use only:* | |
|---|---|
| MID: | |
| MCC: | Office No.: |
| Branch Code: | Rep Name: |

## BANK DISCLOSURE

The account number assigned to Merchant indicates which Bank accepted Merchant's offer to procure the Services.

Chesapeake Bank

Chesapeake Bank
*Kilmarnock, VA*
97 N Main Street
Kilmarnock, VA 22482
757-941-1335
Account no. starts with 5738

Avidia Bank

Avidia Bank
Hudson, MA
42 Main Street
Hudson, MA 01749
978-562-2222
Account no. starts with 6753

**IMPORTANT MEMBER BANK (ACQUIRER) RESPONSIBILITIES**

1. A Visa or MasterCard Member is the only entity approved to extend acceptance of Visa or MasterCard products directly to a Merchant.
2. A Visa or MasterCard Member must be a principal (signer) to the Merchant Agreement.
3. The Visa or MasterCard Member is responsible for educating Merchants on pertinent Visa or MasterCard Operating Regulations with which Merchants must comply.
4. The Visa or MasterCard Member is responsible for and must settle funds with the merchant.
5. The Visa or MasterCard Member is responsible for all funds held in reserve that are derived from settlement.

**IMPORTANT MERCHANT RESPONSIBILITIES**

1. Ensure compliance with cardholder data security and storage requirements. (To review requirements go to ***www.Visa.com***, select Run Your Business, Visa Security, For Merchants, Explore CISP Website; go to ***MasterCard.com***, select Merchants, Safety Security, Security Requirements, Learn about the PCI Data Security Standard; and / or contact our customer service team.)
2. Maintain fraud and chargeback ratios below thresholds.
3. Review and understand the terms of the Merchant Agreement.
4. Comply with Visa and MasterCard Operating Regulations. (Go to ***www.Visa.com***, select Small Business and Merchants, select Operations and Risk Management, select Rules for Visa Merchants to view requirements. Go to ***MasterCard.com***, select Merchants, MasterCard Rules to view requirements.) The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the merchant understands some important obligations of each party and that the Visa or MasterCard Member (Acquirer) is the ultimate authority should the merchant have any problems.

Michal Skarzynski (Jul 27, 2024 20:08 EDT)
**Signature**

FOR CALIFORNIA RESIDENTS' PRIVACY POLICY AND NOTICES, SEE TERMS AND CONDITIONS SECTION 30.

## BUSINESS INFORMATION

| | |
|---|---|
| **Corporate or Legal Name:** Mm Production Enterprises, LLC | **Type of Ownership:** ☐ Sole Proprietor ☐ Corporation ☐ Partnership ☑ LLC ☐ Non Profit |
| **Doing Business As (DBA):** solutionpeptides.net | **Federal Tax ID** *(Nine Digits)*: [redacted] — **Authorized Contact Person:** Michal Skarzynski |
| **Corporate Address:** 1760 N Jog Rd Suite 150 | **Location Address** *(where transactions take place)* ☐ Same as Corporate: 210 Royal Palm Beach Boulevard |
| **City:** west palm beach — **County:** Palm Beach — **State:** FL — **Zip:** 33411 | **City:** Royal Palm Beach — **County:** Palm Beach — **State:** FL — **Zip:** 33411 |
| **Telephone Number:** 888-841-6566 — **Fax Number:** | **Telephone Number:** 888-841-6566 — **Fax Number:** |
| **Business Email Address:** admin@solutionpeptides.net — **Mail to:** ☑ Corporate ☐ Location | **Web Address:** solutionpeptides.net |

| BANK INFO | Bankcard Depository | Bank Routing # | Account # |
|---|---|---|---|
| | pnc | [redacted] | [redacted] |

### MERCHANT PROFILE

| | |
|---|---|
| **Year Business Established:** 09/02/2022 | **No. Locations:** 1 |
| **Length of Ownership** YRS MOS | **Length at Location** YRS MOS |

**Type of Business**
Retail Internet Restaurant w/Tip
Lodging Service Trade/Craft Shows
Mail/Phone Order

**Type of Goods Sold**
research chemicals

### CREDIT CARD TRANSACTION PROFILE

| **Type of Sales:** | Must Total 100% |
|---|---|
| In Person Sales | % |
| Mail/Telephone Order | 1.00 % |
| Internet | 99.00 % |
| **Origination of Transactions** | Must Total 100% |
| Card Present | % |
| Card Not Present | % |

**Monthly Sales Volume: $** 1,000,000.00

| **Average Ticket Size:** | **Highest Ticket Size:** |
|---|---|
| $ 250.00 | $ 5,000.00 |

### PROCESSING HISTORY

| Question | Answer |
|---|---|
| Has the business or any associated owner ever been terminated as a VISA® / MasterCard® / Discover® / American Express® merchant? | ☐ Yes ☑ No |
| Do you currently accept VISA® / MasterCard® / Discover® / American Express®? If YES, please submit 3 most current monthly statements. | ☑ Yes ☐ No |
| Are there third parties/payment applications involved with your payment process? If YES, identify | ☐ Yes ☑ No |
| Is your business PCI compliant? | ☑ Yes ☐ No |
| Has your business had any ongoing or prior data compromise investigations? | ☐ Yes ☑ No |
| Has the business been previously identified with Visa Risk Programs? If YES, when and what program | ☐ Yes ☑ No |

EXHIBIT
A

national processing

**MERCHANT APPLICATION / AGREEMENT**

## OWNERS AND OFFICERS

You must provide the name, date of birth, address and social security number of (i) each person who directly or indirectly owns 25% or more of the business, and (ii) if not a listed owner, at least one person with significant responsibility for managing the business. Failure to do so may result in immediate termination of your account, as well as penalties for violation of Financial Crimes Enforcement Network Anti Money-Laundering rules. Attach additional sheets if necessary. Bank or NP may perform investigations to validate this information.

| Name (1) | | | SSN | | Title | | |
|---|---|---|---|---|---|---|---|
| michal skarzynski | | | [redacted] | | owner | | |
| Residential Address | City | State | Zip | Email Address* | | Time at Residence YRS MOS | OWN RENT |
| [redacted] | [redacted] | [redacted] | [redacted] | admin@solutionpeptides.net | | | |
| Drivers License or State ID & Expiration | State of Issue | Equity Ownership % | Management Responsibility? | ☑ Yes ☐ No | Date of birth | Residence Telephone | Mobile Phone* |
| [redacted] | [redacted] | 100.00 % | | | 08/17/1982 | [redacted] | [redacted] |
| Name (2) | | | SSN | | Title | | |
| Residential Address | City | State | Zip | Email Address* | | Time at Residence YRS MOS | OWN RENT |
| Drivers License or State ID No. | State of Issue | Equity Ownership % | Management Responsibility? | ☑ Yes ☐ No | Date of birth | Residence Telephone | Mobile Phone* |
| Name (3) | | | SSN | | Title | | |
| Residential Address | City | State | Zip | Email Address* | | Time at Residence YRS MOS | OWN RENT |
| Drivers License or State ID No. | State of Issue | Equity Ownership % | Management Responsibility? | ☐ Yes ☐ No | Date of birth | Residence Telephone | Mobile Phone* |
| Name (4) | | | SSN | | Title | | |
| Residential Address | City | State | Zip | Email Address* | | Time at Residence YRS MOS | OWN RENT |
| Drivers License or State ID No. | State of Issue | Equity Ownership % | Management Responsibility? | ☐ Yes ☐ No | Date of birth | Residence Telephone | Mobile Phone* |
| Name (5) | | | SSN | | Title | | |
| Residential Address | City | State | Zip | Email Address* | | Time at Residence YRS MOS | OWN RENT |
| Drivers License or State ID No. | State of Issue | Equity Ownership % | Management Responsibility? | ☐ Yes ☐ No | Date of birth | Residence Telephone | Mobile Phone* |

* By providing your residence telephone number, mobile telephone and email you agree that the Bank or NP may from time to time make calls and/or send text messages to you at any telephone number associated with your account, including mobile telephone numbers that could result in charges to you. The manner in which these calls or text messages are made to you may include, but is not limited to, the use of pre-recorded/artificial voice messages and/or automatic telephone dialing system. You further consent to receiving emails at any e-mail address you provide the Bank or NP or use other electronic means of communication to the extent permitted by law. You have the right to revoke your consent at any time and may opt out of receiving these communications by contacting us at help@nationalprocessing.com or text stop to 714568 to end SMS marketing messages. Consent may be revoked at any time and by any reasonable means.

## AMERICAN EXPRESS

☑ By checking this box, Merchant elects to accept payments via American Express (Ineligible Merchants will not be enrolled). Merchant may opt out of accepting American Express Cards at any time without directly or indirectly affecting its rights to accept other Cards. Merchant No. ______________________ (If currently accepting American Express).

☐ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express

national processing

MERCHANT APPLICATION / AGREEMENT

## SCHEDULE OF FEES

| VISA, MASTERCARD, DISCOVER | | |
|---|---|---|
| Item | Rate % | Per Item |
| Interchange Plus Credit | 6.5 | 0.25 |
| Interchange Plus Debit | | |
| Qual Discount Rate Credit | | |
| Qual Discount Rate Debit | | |
| Mid-Qual Debit/Credit | | |
| Non-Qual Debit/Credit | | |
| Flat Rate Program | | |
| PIN Debit | | |
| Authorization | | |
| Batch Settlement | | |
| Address Verification Service (AVS) | | |
| Other: | | |

| AMEX OPTBLUE DISCOUNT | | |
|---|---|---|
| Item | % | Per Item |
| AMEX Wholesale Fee Plus | 6.5 | 0.25 |
| AMEX Flat Rate Program | | |
| AMEX OptBlue Authorization | | |
| | | |
| | | |
| | | |

| CARD SERVICES | | |
|---|---|---|
| Item | Per Item | |
| Service Fees: gateway/wireless | 25.00 | mo |
| Online Reporting/Statement | | mo |
| Chargeback | 45.00 | |
| Retrieval | 25.00 | |
| Annual PCI Compliance | | yr |
| PCI Non-Compliance | 89.95 | mo |
| Software Bundle | mo | yr |
| EBT Food | | |
| EBT Cash | | |
| EBT FNS | | |
| Equipment Insurance | mo | yr |
| Other: | | |

Tiered Pricing for VISA®/MasterCard®/Discover® Credit Card and Unregulated Signature Debit Transactions, additional charge of $0.10 and 2.35% of sales amount for Transactions that do not meet the Best Qualified Interchange rate qualification criteria. Merchant will be charged the fee of $25.00 per returned ACH item. For restaurants, supermarkets, hotel, passenger transport and gas station merchants, Transactions using standard, reward, enhanced, and world Visa/MasterCard Credit Cards and Unregulated Signature Debit Cards will be surcharged 0.95%. Card Brands' network Transaction fees, assessments and $0.10 will be charged to the Merchant on every Transaction. PIN Debit fees include base switch, Acquirer, Interchange and Authorization expenses. All Signature Debit Card sales will be surcharged $0.10 per Transaction. Regulated Signature Debit Card Transactions will process at the Lowest Qualified Credit Card rate unless otherwise specified. Unregulated Signature Debit Card Transactions will process at the corresponding Credit Card rate unless otherwise specified. Merchant will pay all applicable Card Brand registration fees. Any "Interchange Plus" rates shall apply to Visa, Master Card and Discover. Merchant agrees to comply with PCI Council Data Security Standards (hereinafter defined) within 90 days after signing this Agreement. Section 9 of this Agreement provides more detail as to how Merchant fees contained in this Schedule of Fees, as amended from time to time, are calculated. This Schedule of Fees does not provide all information pertinent to this Merchant Agreement. Merchant acknowledges having received and reviewed a copy of this Agreement and hereby accepts all of its terms including the accompanying Terms & Conditions. THE ABOVE SCHEDULE OF FEES IS PREDICATED ON THE BUSINESS' AVERAGE MONTHLY SALES VOLUME, AVERAGE TICKET SIZE AND HIGHEST TICKET SIZE DISCLOSED HEREIN. OFFICERS AND OWNERS OF MERCHANT WARRANT THAT THOSE ARE ACCURATE AND ACKNOWLEDGE THAT ANY VARIANCE MAY RESULT IN THE DELAY OR THE WITHHOLDING OF FUNDS SETTLEMENT OR TERMINATION OF THE MERCHANT AGREEMENT. THIS IS AN AUTOMATICALLY RENEWABLE MONTHLY MERCHANT CONTRACT.

## AGREED AND ACCEPTED

All information contained in the attached Merchant Application was provided by owners and/or authorized officers of Merchant, who hereby represent and warrant that all such information and documentation submitted in connection with this Merchant Application is true, complete and correct No spaces were left incomplete. N/A or None is to be filled in any space where applicable.

Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. Merchant consents to the Bank or NP pulling a business credit report and/or performing an Investigative Business Report in connection with the attached Application and on a continuing basis in connection with the maintenance, renewal, or extension of this Agreement or any business credit granted hereby.

Merchant hereby irrevocably authorizes Bank and NP to initiate debit/credit entries to Merchant's checking account via Automated Clearing House transactions in accordance with this Merchant Agreement. This authority shall survive the termination of this Agreement. This authorization extends to such entries in said account concerning lease, rental or purchase agreement applying to POS terminal, accompanying equipment, check guarantee fees and/or gift card / loyalty program fees.
Merchant acknowledges that its obligations to NP and Bank under this Agreement relate to NP' processing of transactions on behalf of Merchant and that, as such, this Agreement is solely for commercial and business purposes, and not for personal, family or household purposes.

Merchant acknowledges having received and read a copy of this Agreement, including the attached Terms and Conditions which are incorporated herein by reference, that it agrees to be bound by the Agreement and all of its terms, and that the Agreement shall not be effective until approved by Bank and NP.
For Ohio applicants: You understand that the Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

Mm Production Enterprises, LLC

Print Merchant Legal Name

(1) Sign X [signature] Michal Skarzynski (Jul 27, 2024 20:08 EDT) Title owner Date Jul 27, 2024

(2) Sign X ____________ Title ____________ Date ____________

**CORPORATE RESOLUTION**

The officers identified in #1 and #2 have the authority to execute the Merchant Agreement with BANK and NP on behalf of the corporation.

Sign X [signature] Michal Skarzynski (Jul 27, 2024 20:08 EDT) Title owner Date Jul 27, 2024

national processing

MERCHANT APPLICATION / AGREEMENT

## PERSONAL GUARANTY FROM OWNER/OFFICER

In consideration of BANK and NP entering into this Merchant Agreement ("Agreement") with the above named Merchant, the undersigned (jointly and severally if more than one) hereby absolutely and unconditionally guarantee(s) the full and prompt payment by MERCHANT of any and all amounts it owes to BANK and NP, and the performance of all MERCHANT'S obligations, under this Agreement as may be subsequently amended from time to time, whether before or after termination or expiration of the Agreement. This Guaranty is a guaranty of payment, and not of collection, and a debt of the undersigned guarantor(s) for his or her own account. The undersigned guarantor(s) agree(s) to pay or perform upon demand and waive(s) any notice, presentment, demand, collection from others or any delay in enforcement. This Guaranty includes (i) any amount returned by the BANK and NP after receipt due to any bankruptcy or similar law and (ii) BANK's and NP's expenses including attorney fees and costs. Any sums owing by the MERCHANT to the undersigned guarantor(s) shall be subordinated to sums owed to BANK and NP. This Guaranty is continuing, binding upon heirs and successors and may not be changed except in writing and signed by BANK and NP. The undersigned hereby authorize(s) BANK and NP to obtain from any credit reporting agency financial or credit information pertaining to the undersigned and give(s) BANK and NP continuing authority to obtain such information in connection with the maintenance, renewal or extension of the Agreement. Guarantor(s) acknowledge(s) and agree(s) that this guaranty is made as part of a transaction that is solely for business and commercial purposes and is not primarily for personal, family, or household purposes.

Each Guarantor agrees to be bound by this Agreement, including the attached Terms and Conditions, and agrees that (i) the personal jurisdiction and exclusive venue of any claim shall lie in the federal or state courts of Cuyahoga County, Ohio, (ii) any Arbitration shall exclusively and solely be held in Cleveland, Ohio, and (iii) all objections to said jurisdiction are hereby waived.

(1) Sign X Michal Skarzynski (Jul 27, 2024 20:08 EDT) Jul 27, 2024 michal skarzynski

NO TITLE PERMITTED Date PLEASE PRINT NAME

(2) Sign X________________

NO TITLE PERMITTED Date PLEASE PRINT NAME

## APPROVAL

This Agreement shall be effective only upon (i) acceptance and/or signature by NP, and (ii) the approval of Bank (as evidenced here or elsewhere). Merchant's submission of transactions under this Agreement shall constitute Merchant's acknowledgment of acceptance of this Agreement by Bank and NP.

NP Approval: ________________

Signature Title Date

Bank Approval: ________________

Signature Title Date

national processing

MERCHANT APPLICATION / AGREEMENT

## Product Advertising, Sales, and Delivery

Officers and owners of merchant warrant that the information contained in this profile is true and accurate and considered a part of the Merchant Application and Agreement. Merchant understands that any variances in this information may result in the withheld settlement of funds or termination of the Merchant Agreement.

michal skarzynski

Officer/Owner Name

Michal Skarzynski (Jul 27, 2024 20:08 EDT)

Signature and Title

[redacted]

City, State, Zip Code

[redacted]

Date

1. Please describe in detail the product(s) or service*(s) being marketed when using credit cards:

research chems

☐ Yes
☒ No

*Service at Cardholders Site

2. How is merchandise/service available to the cardholder?

☐ Delivery/Carrier Service ☐ Flea/Tradeshows
☐ Customer Pickup ☒ On-Line
☐ Merchant's Vehicle Delivers ☒ U.S. Postal
☐ At Cardholder's Establishment
☐ Other

3. How long after charging the customer is the product fulfilled or does the service begin?

Within 24-48 hours

4. How long after the time of order does the Cardholder receive the Product or Service?

2-5

5. Does the merchant charge a restocking fee? Include any published information pertaining to restocking fee.

No

6. What is the merchant's refund and return policy? Include any published information.

100% 30 days

7. Is the Cardholder charged at:

☒ Time of Order
☐ Upon Shipment

8. Do you have a retail location (for MOTO/Internet Merchants)? If yes, please confirm physical address

NO

9. What methods are used to market your products? Please include copies of any ads or direct mail pieces being used. For mail order sales, please include an example of the product order form that includes the credit card account number information, cardholder signature, and shipping address information.

☐ Catalog ☐ Newspaper Ad ☐ Brochures
☒ Internet ☐ Sales Reps ☐ Magazines
☐ Cold Calls ☐ Phone Book ☒ Referrals
☐ Other

10. Where is the product inventory housed and maintained?

☒ Merchant location described in application
☐ Merchant warehouse location at

210 Royal Palm Beach Boulevard, Royal Palm Beach FL 33411

Address

City, State, Zip Code

☐ 3rd Party fulfillment center? If so, provide fully executed fulfillment agreement

Company Name

Address

City, State, Zip Code

Telephone

Contact Name

Does the merchant use a fulfillment company to warehouse and ship their product?

☐ Yes, If so, provide fully executed Fulfillment agreement.
☒ No

Company Name

Address

City, State, Zip Code

Telephone

Contact Name

11. For Telephone order sales, where does the cardholder call to place the order and who records the credit card account number information and authorizes the sale?

☒ Merchant staff
☐ Third Party Call Center

Company Name

Address

City, State, Zip Code

Telephone

Contact Name

12. Who is responsible for issuing customer refunds?

☒ Merchant staff
☐ Third Party Call Center

Company Name

Address

City, State, Zip Code

Telephone

Contact Name

13. Who is responsible for providing customer service?

☒ Merchant staff
☐ Third Party Call Center

Company Name

Address

City, State, Zip Code

Telephone

Contact Name

national processing

MERCHANT APPLICATION / AGREEMENT

## TERMS AND CONDITIONS

THIS MERCHANT AGREEMENT (the "Agreement"), which includes these Terms and Conditions and the attached Merchant Application (the "Application"), is made and entered into by and among Chesapeake Bank, a national banking association, Avidia Bank, a national banking association, depending upon which such institution is settling Transactions for Merchant as described in the Application ("Bank"), National Processing LLC, a Utah limited liability company ("NP"), and the undersigned Merchant ("Merchant") and its guarantor(s).

WHEREAS, Bank is engaged in the business of providing sponsorship and settlement services to Merchants that accept Visa®, U.S.A., Inc. ("Visa"), MasterCard® International, Inc. ("MasterCard"), or Discover® Financial Services ("Discover") cards for payment for goods and/or services sold, rented or rendered by Merchant; and

WHEREAS, NP is registered with Visa as an Independent Sales Organization, with MasterCard as a Member Service Provider, with Discover® Financial Services ("Discover") as an acquirer, and with American Express® Travel Related Services Company, Inc. ("American Express") as an OptBlue® Participant Sales Entity (American Express, Discover, Visa and MasterCard, each a "Card Brand", and, collectively with any other card brands, the "Card Brands," and any valid credit or debit card of the Card Brands, or any valid off-line debit card, a "Card") and has agreed with the Bank to provide credit card processing, authorization and related services for Merchants that use Bank's settlement services for Card transactions (individually, a "Transaction", and, collectively, "Transactions"); and

WHEREAS, Merchant desires to use the services of Bank and NP to authorize, process and settle Transactions undertaken by any authorized user of a Card (collectively, the "Services") in accordance with the rules, regulations, procedures and requirements imposed or adopted by Visa, MasterCard, Discover, American Express or other Card Brands as amended from time to time (the "Rules") and on the terms and conditions hereinafter set forth; and

WHEREAS, as described in the Application's Schedule of Fees or in other separate documentation, Merchant desires to utilize other products or services offered by NP or its affiliates, but not by or through Bank, including but not limited to the sale, lease or license of Point of Sale ("POS") devices, software or related equipment, or the provision of web hosting services, gift card services, customer loyalty cards and systems (the "Non-Bank Services").

NOW, THEREFORE, in consideration of the foregoing and of the representations, covenants and agreements set forth in this Agreement, the parties hereby agree as follows:

1. Honoring/Acceptance of Cards. Merchant shall honor and accept, without discrimination, all valid Cards when properly presented as payment by a cardholder or authorized user and upon obtaining authorization for each Transaction in advance from the authorization center in accordance with the terms and conditions of this Agreement. The Rules establish two categories of Visa Cards (Debit Cards and Credit Cards) and allow a merchant to accept one category and not another ("Limited Acceptance"). Merchant shall not engage in Limited Acceptance unless clearly identified on the Schedule of Fees, approved by Bank and NP, and registered with Visa as required by the Rules. Merchant shall not accept a Card for any unlawful transaction. Merchant will submit all authorized Transactions for its business exclusively to Bank and NP. Merchant will pay all Card Brand fines, fees, costs and all other assessments or indebtedness however labeled or defined levied by Card Brands and/or regulatory agencies to Bank or NP which are attributable, at the Bank's or NP' discretion, to Merchant's transaction processing or business, and Merchant agrees its obligations hereunder, and any costs, fines, penalties, assessments and other amounts relating thereto incurred by Bank or NP, shall be deemed direct, not a penalty, indirect or consequential, damages, and shall be collectible from Merchant notwithstanding any provision in this Agreement to the contrary. Merchant shall not indicate that Visa, MasterCard, Discover, American Express or any other Card Brand endorses its goods or services. Merchant has no right to use the proprietary name and/or symbol of Bank, Visa, MasterCard, Discover or American Express except during the term of this Agreement, or until Merchant is notified by Bank, Visa, MasterCard, Discover or American Express to cease such usage, and only to the extent the materials containing such are provided to Merchant by NP or Bank and/or are approved in advance by NP or Bank. Merchant and its guarantor(s) are jointly and severally liable for the obligations of Merchant's establishments under this Agreement.

2. Point of Sale Devices. (a) Merchant shall utilize and maintain, at Merchant's expense, POS devices and terminal(s), proprietary software and related equipment approved by Bank and NP for all Transactions, in a format and medium of transmission acceptable to Bank and NP. Merchant will implement the Integrated Circuit Card Specifications for Payment Systems (global payment industry specifications that describe the requirements for interoperability between chip based consumer payment applications and acceptance terminals to enable payment, also referred to as "EMV") when required by NP, Bank or a Card Brand, and such implementation may require upgrade or replacement of terminal or point of sale hardware and software. Bank and NP shall have no liability or responsibility for any negligent design or manufacture of any POS terminal or printer, or for any proprietary software or related equipment; NP' entire liability, if any, and Merchant's exclusive remedy in all situations, shall be to perform repair services on any inoperative POS terminal or printer sold or leased by NP. (b) Merchant shall record each transaction by swiping, inserting or tapping the Card through the POS terminal whenever possible. Merchant acknowledges that each outlet, retail location, or business terminal and entity will have its own POS Merchant identification number. Merchant understands and agrees that sales completed at one location cannot be processed through a terminal at another location. (c) In the event of breakdown of the POS terminal or other system failure, Merchant shall immediately contact the designated Merchant Help Desk. In such case, Merchant shall imprint each sales draft with the embossed data from each Card using Merchant's imprinter plate if obtained manually or the electronic equivalent obtained by swiping, inserting or tapping a Card through the POS terminal and electronically capturing the data, and Merchant will obtain the cardholder's or authorized user's signature which must match the signature on the Card. If Merchant uses an electronic printer connected to a POS terminal, Merchant must still obtain the cardholder's or authorized user's signature on the printed sales draft. As soon as a POS Terminal is operable, Merchant will enter all transactions engaged in during such period. Failure to comply with these requirements may result in a Chargeback. (d) Merchant is responsible for all telephone and communication fees and charges with respect to POS terminals.

3. Card Brand and Payment Card Industry Rules. (a) Merchant shall fully comply with and abide by the Rules including without limitation the following which Merchant acknowledges are strictly enforced by Visa, MasterCard and American Express: (i) any use of a mark by Merchant in acceptance advertising, acceptance decals, or signs, must be in accordance with the Rules as may be in effect from time to time; (ii) Merchant's use or display of any mark will terminate effective with the termination of the Merchant Agreement or upon notification by the Card Brand to discontinue such use or display; (iii) Merchant will adequately display the Visa, MasterCard, Discover or American Express service marks, and, if applicable, on promotional materials to inform the public which Cards are to be honored at Merchant's place of business; (iv) Merchant will refrain from establishing or implementing procedures that discourage, favor, or discriminate against the use of any particular Card; (v) Merchant will refrain from establishing minimum or maximum transaction amounts as a condition for accepting Cards, except as allowed by the Rules; (vi) Merchant will refrain from imposing any surcharge or fee or any other special conditions for accepting a Card (except as permitted by the Rules); (vii) unless permitted under the Rules, Merchant will refrain from requiring a cardholder to provide any personal information, such as a home or business address or telephone number, or a driver's license or other proof of identification as a condition of honoring a Card, unless instructed by the authorization center (with exceptions for a mail/telephone order or delivery required transaction and zip code for a card-present key-entered transaction in order to obtain address verification); (viii) Merchant shall not require a cardholder to complete a postcard or similar device that includes the cardholder's account number, card expiration date, signature, or any other card account data in plain view when mailed; (ix) Merchant shall not resubmit any Transaction that was previously disputed or charged back to the merchant, irrespective of cardholder approval; (x) Merchant shall not accept a Card to collect or refinance existing debt that has been deemed uncollectible or that represents collection of a dishonored check; (xi) Merchant shall not request or use a customer's card number for any purpose other than for payment for its goods or services; (xii) Merchant shall not disburse funds in the form of travelers cheques, if the sole purpose is to allow the cardholder to make a cash purchase of goods or services from the Merchant; (xiii) Merchant shall not disburse funds in the form of cash, unless permitted by the Rules; (xiv) Merchant will include any taxes and any handling or other fees that Merchant collects in the total transaction amount as opposed to collecting them separately in cash or processing them as additional transactions (it being understood that Merchant is responsible for the payment of all taxes applicable to Transactions); (xv) Merchant will refrain from accepting a Card for any unlawful Internet gambling transaction; (xvi) Merchant may not accept cardholder payments for previous Card charges incurred at the merchant location; (xvii) Merchant may not accept a Card for the purchase of Scrip; (xviii) Merchant will comply with the Rules relating to cardholder information security issues, non-disclosure of cardholder information and Transaction documents, retention and storage of cardholder and Transaction information, and other security procedures adopted by the Card Brands or the Payment Card Industry Security Standards Council (the "PCI Council"), (xix) Merchant may not request the Card Verification Value 2 (CVV2) data on any paper order form, or store CVV2 information subsequent to authorization; (xx) all indebtedness arising from Transactions will be for bona fide sales of goods and services (or both) at Merchant's establishments and free of liens, claims, and encumbrances other than ordinary sales taxes. (b) The PCI Council has implemented programs and standards to protect cardholder data. The PCI Council Data Security Standards ("DSS") as they change from time to time apply to Merchant and its agents. A copy of the complete PCI Council DSS can be obtained online at www.pcisecuritystandards.org. (c) Visa, MasterCard, Discover and American Express have implemented programs to protect cardholder data. The Visa Cardholder Information Security Program ("CISP") and MasterCard Site Data Protection Program ("SDP") apply to Merchant if Merchant processes or stores cardholder data as a result of internet or mail/telephone acceptance of Visa or MasterCard Card account information. A copy of the complete Visa CISP manual and a Self-Assessment Worksheet can be obtained online at www.visa.com/cisp. Along with the MasterCard SDP, these materials can also be obtained from NP's customer service department. A copy of the American Express Data Security Requirements ("DSR") can be obtained online at www.americanexpress.com/dsr. (d) Merchant shall abide by and fully comply with the Rules, DSS, CISP, SDP, DSR, and any other applicable Card Brand programs and standards. To the extent they require Merchant to do so, but without limiting any other requirements imposed by the foregoing, Merchant agrees to: (i) install and maintain a working network firewall to protect data accessible via the Internet; (ii) keep security patches up-to-date; (iii) encrypt stored data; (iv) encrypt data sent across networks; (v) use and regularly update anti-virus software; (vi) restrict access to data by business "need to know"; (vii) assign a unique ID to each person with computer access to data; (viii) refrain from using vendor-supplied defaults for system passwords and other security parameters; (ix) track and monitor access to data by unique user ID; (x) maintain a policy that addresses information security for employees and contractors;(xi) restrict physical access to cardholder information; and (xii) regularly test security systems and processes. If Merchant does not comply with such programs, then, among other things, Visa, MasterCard, Discover, American Express and other Card Brands may impose restrictions and/or fines on Merchant, and/or prohibit Merchant from participating in Visa, MasterCard, Discover, American Express or other Card programs. Merchant may be required to submit to an audit to verify compliance with security procedures. (e) Merchant acknowledges that the sale or disclosure of cardholder account numbers, personal information, or other Transaction information to third parties is strictly prohibited by the Rules. Unless Merchant obtains consents from Bank and NP, and each applicable Card Brand, issuing bank and cardholder, Merchant must not use, disclose, sell or disseminate any cardholder information obtained in connection with a Transaction (including without limitation, the names, addresses and Card account numbers of cardholders, copies of imprinted sales drafts and/or credit records, mailing lists, tapes or other media obtained in connection with a sales draft and/or credit record) except for purposes of authorizing, completing, and settling Transactions, and resolving any Chargebacks, retrieval requests, or similar issues involving Transactions, other than pursuant to a court or governmental agency request, subpoena or order. (f) Merchant shall use proper controls for discarding all records containing cardholder account numbers and Card imprints, and shall limit access to, and render unreadable, such records prior to their being discarded. Merchant may not retain or store magnetic stripe data after a Transaction has been authorized. If Merchant stores any electronically captured signature of a cardholder, Merchant may not reproduce such signature except upon the specific request of Bank or NP. Merchant shall store all media containing cardholder names, cardholder account information, and other personal information, as well as Card imprints (such as sales drafts and credit records, auto rental agreements, and carbons) in an area limited to selected personnel. Merchant further warrants and agrees that in the event of its failure, including bankruptcy, insolvency, or other suspension of business operations, it will not sell, transfer or disclose any materials that contain cardholder account numbers, personal information, or Transaction information to third parties, and shall return the information to Bank or NP and provide acceptable proof of destruction to Bank and NP. Merchant agrees to keep all information it receives from its customers confidential and only use it in connection with the transactions processed under this Agreement. Merchant further agrees to refrain from disclosing or distributing, in any way, any such information to any third party for any purpose except with the prior express consent of the customer. Merchant shall notify and provide information to Bank and NP regarding its use of any service provider that will have access to cardholder data. Merchant must validate that any such service provider(s) are certified as compliant with DSS, CISP, SDP, DSR and similarly established data security standards, and shall assume responsibility for any failure by such service provider(s) to comply with the Rules. If Merchant utilizes any third party processor, Bank shall have no liability to fund Transactions hereunder that are not properly delivered by such

third-party processor to the Card Brands. Merchant assumes responsibility for any failure by any third-party processors to comply with applicable laws and Rules.

4. Mail, Telephone, E-Commerce (Internet), Recurring and Pre-Authorized Transactions. (a) Merchant understands that mail, telephone and e-commerce (Internet) Transactions have a substantially higher risk of Chargeback and cardholder dispute than Card "present" Transactions, as Merchant will not have an imprinted or magnetically "swiped" Transaction with the cardholder's signature on the sales draft. Bank and NP discourage accepting mail or telephone orders and other Transactions in which the Card is not presented by the cardholder in person. Merchant may engage in mail, telephone and e-commerce Transactions only if it requested to do so in the Application and only for the approved percentage of Merchant's total monthly sales volume limit reflected for such Transactions on the Application, or as may otherwise have been approved in writing by Bank and NP. If Merchant exceeds the approved percentages, payment for said Transactions may be withheld by Bank or NP pending further review. Bank and NP may make payment of these Transactions at their sole discretion. Bank and NP reserve the right to establish a Reserve Account pursuant to Section 15 below to fund Chargebacks that may arise from said Transactions. Merchant acknowledges that its failure to disclose true and accurate percentages as part of the Application may result in the establishment by Bank and NP of a Reserve Account, increased discount rate or fees and transaction fees, or the termination of this Agreement. Merchant hereby covenants that all of its Transactions will comply fully with all applicable provisions of Federal consumer protection and other laws including, without limitation, the Electronic Fund Transfer Act, 15 U.S.C. §1601, et seq., the Telemarketing and Consumer Frau d and Abuse Prevention Act, 15 U.S.C. § 6101, et seq., the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a, et seq., the Federal Trade Commission Act, 15 U.S.C. §45(a), and any regulations adopted under or in accordance with any such laws. (b) In connection with all mail order Transactions, telephone order Transactions, periodic charges for recurring goods or services to be provided by Merchant ("Recurring Transactions"), preauthorized order Transactions, and e-commerce (Internet) Transactions, Merchant will take reasonable precautions to protect against Chargebacks, including, but not limited to the following: (i) delivering merchandise only to the cardholder's billing address where the issuing bank sends the cardholder's billing statement; (ii) using a delivery service that maintains shipping logs and requires signatures by a person receiving merchandise; (iii) using AVS and not processing sales unless all information matches the AVS; (iv) obtaining CVV2/CVC2 verification from the issuing bank; (v) obtaining the expiration date of the Card; and (vi) on the sales draft, clearly print the cardholder's account number, effective and expiration dates, date of Transaction, description of the goods and services, amount of the Transaction (including shipping, handling, insurance, etc.), cardholder's name, billing address and shipping address, Authorization code, and Merchant's name and address. (c) If Merchant processes Recurring Transactions and charges a cardholder's account periodically for recurring products or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), then in addition to other applicable procedures and the Rules, Merchant must do the following: (i) have the cardholder complete and deliver to Merchant a written request and consent for such products or services to be charged to cardholder's account (such request to specify, at a minimum, the transaction amounts, the frequency of recurring charges, and the duration of time for which the cardholder's consent or permission is granted, and must be provided promptly in response to a cardholder's request for a copy); (ii) if the Recurring Transaction is renewed, the cardholder must complete and deliver to Merchant a subsequent written request for the continuation of such products or services to be charged to the cardholder's account; (iii) Merchant may not complete a Recurring Transaction after receiving a cancellation notice from the cardholder or issuing bank or after a request for Authorization has been denied; (iv) Merchant must obtain an Authorization for each Transaction and type or print legibly on the signature line of the sales draft for Recurring Transactions the words "Recurring Transaction" (and "PO" for MasterCard Transaction) in lieu of the cardholder's signature, and must provide both an invoice number and the appropriate "Recurring Transaction" indicator with each Authorization request; (v) Merchant must perform an AVS inquiry for at least the first Transaction and then annually thereafter, if applicable (Merchant understands that penalties can be assessed by the Card Brands for failure to use the Recurring Payment Indicator); (vi) a Recurring Transaction or Pre- authorized order may not include partial payments for products or services purchased in a single Transaction; and (vii) no finance charge may be imposed in connection with a Recurring Transaction or Pre-authorized order. Pre-authorized Transactions may be submitted if Merchant advises the cardholder that it will be immediately billing his or her Card at the time of the transaction for prepayment of services or for full prepayment of custom-ordered merchandise to be manufactured to the cardholder's specifications. Merchant acknowledges that Transactions with an Authorization date more than thirty (30) days prior to shipping date or date of service are subject to an increased risk of Chargeback. (d) If Merchant is an e-commerce merchant and accepts orders via the Internet, in addition to other applicable procedures and the Rules, Merchant must do the following: (i) post its privacy and security policies on its websites, where such policies shall be clearly marked for consumers to see and review; (ii) prominently display the name of the Merchant (as both the identity of the Merchant and as the name that will appear on the Cardholder Statement) on its website along with all the following information: (A) complete description of the products or services offered, (B) returned merchandise and refund policy, (C) method for the cardholder to acknowledge his acceptance of the terms and conditions for returned merchandise or for the refund policy (this acknowledgment to comply with Card Brand guidelines for proper disclosure), (D) customer service contact, including e-mail address and/or telephone number, (E) Transaction currency (U.S. dollars, unless permission is otherwise received from Bank and NP), (F) any applicable export or legal restrictions, (G) delivery policy, (H) consumer data privacy policy, and (I) a description of the Transaction security used on Merchant's website. Merchant acknowledges that the Electronic Commerce Indicator must be used to identify e- commerce Transactions in the Authorization request and clearing record. Penalties may be assessed for failure to use the correct Electronic Commerce Indicator.

5. Fraudulent Sales, Factoring or Laundering. Merchant shall never accept or deposit or enter into its POS terminal a fraudulent Transaction or any Transaction not authorized by the cardholder, or a Transaction made by any entity other than the Merchant. Should Merchant do so, Bank or NP may immediately terminate this Agreement, have all funds placed into a Reserve Account pursuant to Section 15 below and be placed on the "Combined Terminated Merchant File" as required by the Rules. Said action may result in Merchant's being restricted from settling Transactions with any bank in the future. Merchant hereby releases Bank and NP and agrees to hold Bank and NP harmless from any claims, liabilities, losses or damages arising out of or resulting from Merchant's being placed on any such restrictive list

6. Authorization. Approval by, or on behalf of, a cardholder's bank or the bank that issued the Card (hereinafter, "Authorization") is required on all Transactions. Merchant understands and acknowledges that an Authorization only confirms the availability of the cardholder's credit at the time of the Authorization; it does not warrant that the person presenting the Card is the rightful cardholder, nor is it an unconditional promise, guarantee or representation by Bank or NP that a Transaction is or will be deemed valid and not subject to dispute, debit or Chargeback (as hereinafter defined). Merchant acknowledges and understands that its floor limit shall be Zero and that all Transactions must be authorized in advance through the authorization center. Merchant shall request Authorization for the exact amount of the Transaction on the date the Transaction takes place by physically sliding or inserting the Card through the Card reader of the terminal (or tapping the EMV Card in the case of an EMV Transaction) thereby causing the terminal to electronically read a magnetically encoded stripe or EMV chip on the reverse side of each Card or keying the account number, expiration date, amount and address verification ("AVS") information into the terminal. If the electronic Card terminal is not functioning, Merchant may obtain Authorization by telephone, calling the voice authorization phone number provided by Bank or NP. Merchant must provide the voice authorization center the Card account number, expiration date and the amount of the sale. In order to process any approved voice authorization, when the electronic credit card terminal is functioning, the transaction must be key entered utilizing the "force", "offline", or "post authorization" function. Merchant agrees that in connection with the acceptance of Cards (in addition to, and not in lieu of, other applicable procedures and Rules) it will comply with the following procedures and Rules: (a) it will not accept any Card that is not yet valid or has expired; (b) it will verify that the Card is not stolen, fraudulent or counterfeit; (c) it will use due diligence to verify that a cardholder is authorized to use the Card presented; (d) at the point of sale, it will (i) carefully examine the signature on every Card presented and carefully compare the signature on the Card to the sales record, and (ii) check the date on which the Card becomes valid and the date on which the Card expires; (e) for Card present Transactions when the signature panel for a Visa Card is not signed Merchant shall in addition to requesting an Authorization (i) review positive identification bearing the cardholder's signature to validate the cardholder's identity, (ii) indicate the positive identification, including any serial number and expiration date, on the Transaction receipt, (iii) and require the cardholder to sign the signature panel of the Card prior to completing the Transaction; when the signature panel for a MasterCard Card is not signed and the cardholder refuses to sign the Card, Merchant shall not accept it for a Transaction, but if the cardholder is willing to sign the Card in the presence of Merchant, Merchant shall request two pieces of valid and current identification; and (g) for Visa and MasterCard, a signature panel bearing the words "See I. D." or equivalent language shall be deemed to be blank, and in either case, if such identification is uncertain, or if Merchant otherwise questions or has suspicions regarding the validity of the Card, Merchant shall contact Bank's designated authorization center for instructions. If Authorization is denied, the Transaction shall not be completed and Merchant shall follow instructions from the authorization center, including recovery of Cards by reasonable and peaceful means. Merchant shall retain or retrieve Cards, as required by the Rules, which are expired or for which reasonable grounds exist to believe that such Cards are counterfeit, fraudulent or stolen.

7. Settlement. Merchant agrees to balance and settle its POS device transactions daily and to electronically submit sales no later than the day following the date of Authorization. Transactions submitted for settlement more than one day after the date of Authorization may be refused, become subject to Chargeback or assessed additional fees by Bank and NP. Transactions charged to a Card issued by a foreign (non-U.S.A.) issuer or a commercial card issued for business purposes may be assessed additional fees. Merchant acknowledges that all transactions between Merchant, Bank and NP under this Agreement shall be treated as a single transaction and that all settlements are provisional subject to the cardholder's rights under the Rules for disputing charges against the cardholder's account.In submitting transactions to Bank and NP, Merchant endorses and assigns to Bank and NP all right, title and interest to such items with rights of endorsement. Bank and NP have the right to receive payment on all Transactions acquired and Merchant will not attempt to collect any such Transactions. If any payment is received, Merchant will hold it in trust and promptly deliver it to Bank or NP.

8. Payment. Merchant may not assign to any third party any payments due to it under this Agreement, provided, however, that Merchant may sell and assign future Transaction receivables to NP, its affiliated entities and/or any other cash advance funding source that partners with NP or its affiliated entities. Unless the context indicates otherwise, when used in this Section 8, "Bank" refers to the Bank and/or NP (to the extent authorized by Bank and not prohibited by the Rules). Merchant shall at all times maintain a commercial checking account with Bank or with another financial institution of Merchant's choice acceptable to Bank and NP that belongs to the Automated Clearing House ("ACH") network, that can accept ACH transactions, and that Bank will use to debit and/or credit funds on a daily or monthly basis ("Merchant's Bank"). Bank will debit Merchant's Designated Deposit Account at Merchant's Bank ("DDA") daily for the Discount Fees. Merchant agrees to cooperate with Bank to help resolve any problems in crediting/debiting Merchant's DDA. Merchant agrees to be bound by the terms of the operating rules of the National Automated Clearing House Association as in effect and modified from time to time. Merchant hereby authorizes Bank to access information from the DDA and to initiate credit and/or debit entries and adjustments to Merchant's DDA by bank wire or ACH transfer process and/or through direct instructions to Merchant's Bank for amounts due under this Agreement and under any agreements with Bank or its affiliates for any related services, as well as for any credit entries in error. Merchant hereby authorizes the Merchant's Bank to effect all such debits and credits to the Merchant DDA. This authorization is without respect to the source of any funds in the DDA, is irrevocable and is coupled with an interest, and shall remain in full force and effect after the termination of this Agreement until Bank gives written notice to Merchant's Bank that all monies due under this Agreement and under any other agreements with Bank or its affiliates for any related services have been paid in full. All settlements for Visa, MasterCard, Discover and American Express Card Transactions will be net of credits/ refunds, adjustments, applicable Discount Fees when due, Transaction Fees, Chargebacks, reserves, lease payments, rental fees, Minimum Discount Fees, or other adjustments, charges and any other amounts then due from Merchant. All credits to Merchant's DDA or other payments to Merchant are provisional and are subject to, among other things, final audit by Bank, Chargebacks (including Bank and/or NP related losses) fees, assessments, and fines imposed by the Card Brands. Merchant agrees that Bank may debit or credit Merchant's DDA for any deficiencies, overages, fees, fines, charges, and pending Chargebacks, or may deduct such amounts from settlement funds due to Merchant. Merchant hereby also agrees and authorizes Bank in its sole discretion, to debit any other banking account maintained by Merchant for any and all such amounts. Alternatively, Bank and/or NP may elect to invoice Merchant for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified. Bank and/or NP cannot guarantee the timeliness with which any ACH payment may be credited by Merchant's Bank. Merchant understands that, due to the nature of the ACH and the electronic networks utilized for the movement of funds and the fact that not all banks belong to the ACH Network, payment to Merchant can be delayed. Bank and NP will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties, by Bank and/or NP, including but not limited to any Card Brand or Merchant's financial institution. Merchant acknowledges that the funds due for Visa, MasterCard, Discover and American Express Transactions will generally be processed and transferred to the Merchant's DDA within two (2) business days from the time a batch is closed. Bank reserves the right to divert and hold all funds when Bank and/or NP is investigating suspicious Transactions, the breach of any warranty, covenant, representation, or agreement by Merchant or has reasonable cause to believe that Merchant may have violated a provision of this Agreement, the Rules and/or is engaged in illegal, fraudulent or suspicious activity. In the event that a payment is rejected by Merchant's Bank or fails to arrive within five (5) business days after Bank's attempted ACH payment, Bank may periodically wire transfer any funds due Merchant until the ACH problem is resolved, and all such wire transfers and resolution of all issues shall be solely at the Merchant's expense. If Merchant receives settlement funds by wire transfer, Bank and/or NP may charge a wire transfer fee per wire, which fee will not be subject to refund. Not all fees will be debited on a daily basis, but may be subject to a month end debit to the DDA or other available funds.

9. Discount Fees, Transaction Fees, and Access Fees. (a) The Bank must approve, in advance, any fee to or obligation of the Merchant arising from or related to performance of the Services, but not the Non-Bank Services. (b) Merchant agrees to pay to Bank and NP the Discount Fees, Transaction Fees, Access Fees, and other fees stated in the Schedule of Fees. (c) For the purposes of calculating fees and

other amounts to be paid by Merchant under this Section 10 and the Schedule of Fees (as such is amended from time to time), the following terms have the following meanings: (i) "Discount Fee" means a fee charged on the total value of a Transaction at the applicable Discount Rate disclosed in the Schedule of Fees on the face of this Agreement, as amended from time to time, and incorporated herein; (ii) "Transaction Fee" means a fee charged on each sales draft and each credit record regardless of the total stated and shall also mean a fee charged for any other Transaction which utilizes a POS device for transmission or reception of Card data or information, including but not limited to, Debit Card Transactions, batch closing, Authorizations, and any other communications using the POS device; (iii) the terms "Pass-through" and "Interchange Plus" (or "I/C Plus") mean that in addition to the Discount Rate, per Transaction charges and Assessments (as defined below) indicated on the Schedule of Fees as amended from time to time orotherwise, Merchant shall pay the interchange fees applicable to the type of card presented for payment, and, in the case of American Express, the OptBlue® program fees applicable to the Transaction, and that the first full sentence of the Schedule of Fees shall not apply. Interchange and program fees are set and changed by the Card Brands from time to time and vary based on the Card Brand, regions or jurisdictions, the type of Credit or Debit Card, the type of the accepting merchant, the value of the Transaction, and the type of the Transaction (e.g. transaction size, industry type, online, in-store, phone order, whether the Card is present for the transaction, etc.). The Schedule of Fees, as amended from time to time, may also provide for interchange surcharges on certain categories of Cards presented for payment as defined herein or as commonly used in the payments industry; (iv) the term "Bundled Pricing" means that the Discount Rate and per Transaction charges are the same for all Cards, while the term "Tiered Rate Pricing" means that the Discount Rate and per Transaction charges will vary for certain Tiers (certain categories of Cards presented for payment as defined herein or as commonly used in the payments industry) as described in the Schedule of Fees, as amended from time to time; (v) "Qualified Cards" or "Best Qualified Cards" have the lowest interchange fees. Of the remaining Card types (also known as "Non Best Qualified Cards"), "Non-Qualified Cards" are those with the highest interchange fees, while the "Mid Qualified Cards" have interchange fees that are lower than Non-Qualified Cards and higher than Qualified Cards;(vi) other types of Cards sometimes bundled in Tiered pricing include "PIN Debit" (Debit Cards used with a PIN), "Check Cards" (Debit Cards which are used without a PIN, also called "Signature Debit"), "Regulated Cards" (Check Cards which are issued by certain larger banks and have interchange fees regulated by the Federal Reserve Bank), "Unregulated cards" (Check Cards which are issued by certain smaller banks and do not have regulated interchange fees), International (Cards issued by non-U.S. banks), "Rewards," "Rewards I," and "Rewards II" Cards (Cards which have specified card holder rewards), "EIRF" type Cards, "Business Cards" or "Corporate Cards" (certain Cards issued to businesses), and"EBT" (electronic benefit transaction) Cards; (vii) Transactions involving Cards are described as "Keyed" or "Hand Entered" Transactions (Transactions where the Card is not physically swiped in to a POS device), or "Swiped Transactions" (Transactions which are not Keyed); (viii) Merchant agrees that the classification of the thousands of individual interchange and Card types in to these types of broad categories is complex and is made at the discretion of NP; (ix) as disclosed in the Schedule of Fees, as amended from time to time, Transaction fees are sometimes charged per "Authorization" (the process by which a Card presented for payment and the payment amount are sent to the Card Brand and approved or denied by the Card issuing bank), or by cleared and settled Transactions. An Authorization Transaction Fee shall still be payable under this Agreement even if Merchant contracts separately with American Express for settlement of American Express Transactions (i.e., "Non Bank Card Fee"); (x) "Voice Authorizations" (or Voice ARU) are those obtained by telephone; (xi) the term "Assessments" includes dues, assessments, acquirer fees, network fees, or other Card Brand fees and expenses assessed to Merchant, NP or Bank (NP and Bank sometimes referred to as the "Acquirer") including any surcharges by Bank or NP. Examples of these types of charges include NABU, NAPF, APF, FANF, switch charges, international Transaction surcharge fees or cross border fees, network fees, integrity fee, Card Brand Authorization fees, and Card Brand Assessments. With respect to American Express, Assessments shall also include, but not be limited to the OptBlue® Network Fee, Inbound Fee, Non-Swiped Transaction Fee, Non Compliance Fee, Data Quality Fee, and Excessive Dispute Fees, among others; (xii) a "Batch Header" or "Data Capture" fee is one charged for each batch submitted by or on behalf of the Merchant; (xiii) "Monthly Minimum" fees will be charged to the extent the Transaction fees for Bank Card (Visa, MasterCard or Discover Credit Cards or Signature Debit Cards, plus American Express if settled to Merchant under this Agreement) Transactions are less than the specified minimum; (xiv) other one-time or recurring monthly fees are as described in the Schedule of Fees as amended from time to time; (xv) the term "e- Commerce" means those Transactions accepted through the use of a web site; and (xvi) an "Access fee" is a monthly fee charged for Merchant's access to the applicable Card Brand networks indicated on the Schedule of Fees as amended from time to time. (d) Merchant acknowledges that the monthly fees apply to each Merchant identification number assigned to Merchant. Merchant agrees that the amounts of such fees set forth on the Schedule of Fees may be amended from time to time by NP and Bank pursuant to the terms of this Agreement. (e) Merchant acknowledges that in determining whether to accept the Application and in setting the Discount Rate and Fees, Transaction Fees and other amounts to be charged Merchant, Bank and NP have relied upon the information contained in the Application including but not limited to the type of business in which Merchant is engaged, the product or service sold, the average Transaction or ticket size and monthly volume, the amount of telephone and mail order sales, and the ratio of Keyed/Swiped Transactions. If any of the foregoing information on which Bank and NP relied is materially misstated, or if Merchant changes the nature of its business from that indicated on the Application or otherwise changes its business or goods sold or services rendered in a way that may increase Bank's and/or NP's risks or costs, or lead to excessive Chargebacks, or if Merchant's percentage of on and off premises, mail, telephone, and internet transaction sales varies from that disclosed in the Application, the Discount Rate, as amended from time to time, shall be the sum of (i) the then current Discount Rate plus (ii) Five Percent (5.00%) (or such lower amount that is acceptable to Bank and NP). In the event of a change in the parameters stated above, or should special circumstances arise which shall temporarily or permanently change existing conditions, Merchant must notify Bank or NP prior to those changes, so that adjustments can be made. (f) Fees become due at the time a Transaction is submitted to Bank and NP. Merchant agrees to close batches at least once every business day, and acknowledges the Discount Rate and other fees and charges in the Schedule of Fees, as amended from time to time, are contingent upon the foregoing, and further understands that in the event that batches are not closed at least daily, (i) Bank and NP may initiate batch closing on Merchant's behalf, and (ii) the interchange qualification of Transactions may change, resulting in additional charges as described in the Schedule of Fees, as amended from time to time. (g) Merchant acknowledges that higher Assessment and / or interchange fees apply to sales or credit drafts emanating from foreign (non- U.S.A.) Credit Cards or commercial Cards issued for business purposes. (h) For every Transaction, an Authorization matching the sales amount exactly (or within 15% for hotels and car rentals, 20% for restaurants, bars and night clubs) must be obtained, or a higher Discount Rate and other fees and charges in the Schedule of Fees, as amended from time to time, shall apply. (i) Merchant benefits of Data and Breach protection (1) are provided solely through a third party vendor and neither NP nor Bank shall have any obligation therefor, and (2) are only available in any particular month to the extent Merchant timely documents full compliance in that month with PCI Council Data Security Standards. PLEASE REFER TO THE SCHEDULE OF FEES INCORPORATED INTO THIS AGREEMENT, AS AMENDED FROM TIME TO TIME, FOR THE AMOUNT OF THESE FEES.

10. Sales Drafts. Merchant agrees to use a POS device, computer, telephone and related equipment approved by Bank and NP for transmission of all Transaction data and to record each Transactionby swiping, inserting or tapping the Card through the POS device whenever a Card is present, or if a Card cannot be electronically read, to enter the Card number and expiration date into the POS device manually. Merchant shall prepare a sales draft in legible form for each Transaction. All items, goods and services purchased in a single transaction shall be included in the total amount on a single sales draft. Merchant shall legibly type, print or imprint the following information on each sales draft: (a) the cardholder's name or name of authorized user; (b) the cardholder's account number and expiration date; (c) Merchant's correct name and address of business; (d) the date of the Transaction; (e) the total cash price of the sale (including all applicable state, federal or local surcharges and taxes); (f) the amount to be charged if a partial payment is made in cash or by check, or the amount to be charged if a partial payment is made as a deposit or as the balance owing after a deposit has been accepted; (g) a brief description of the goods or services; (h) the words "deposit" or "balance" if full payment is to be made in this manner at different times on different sales drafts; (i) the authorization approval code from the authorization center: and (j) for telephone orders transactions, the designation "TO", for mail order transactions, the designation "MO", for preauthorized transactions, the designation "PO", and for recurring transactions, the phrase "Recurring Transaction" in each instance shall be typed or printed on the signature line. Merchant will take reasonable steps to verify card information in accordance with the Rules for each Transaction. Merchant warrants the cardholder's identity whether or not Authorization is received and whether or not Card is present. Merchant shall deliver to the cardholder a true and completed copy of the sales draft. Failure to comply with the above requirements will, in addition to other remedies, subject Merchant to immediate termination, the establishment of a Reserve Account under Section 15 hereof, and the Merchant's indemnification obligations to Bank and NP under Section 19 hereof.

11. Retention of Records. Bank and/or NP may examine and verify at reasonable times all records of Merchant pertaining to all Transactions processed hereunder. Merchant will be responsible for the retrieval of all sales drafts and receipts and credit receipts requested by Bank or NP within the time limits established by the Rules. Merchant will retain originals or copies of sales drafts and receipts and credit receipts for at least three (3) years from the processing date of the Transaction. Merchant agrees to deliver the paper copy or facsimile of any such sales drafts and credit receipts in its files to Bank or NP, or to such person as Bank or NP may designate, within such period after request therefor as is required by law or by the Rules. Such requested copies must be legible. Merchant will be responsible for all liabilities arising from any failure to provide an acceptable copy of any sales drafts as required by law or the Rules. Prior to discarding any sales drafts or other records of Transactions, Merchant will destroy, in a manner rendering data unreadable, all material containing cardholder account numbers, Card imprints, and carbons. Merchant shall not under any circumstances retain cardholder information including cardholder name, account number, expiration dates, billing addresses, etc. in a database that can be accessed via a web-based application. Merchant shall indemnify and hold Bank and NP harmless from all judgments, losses, costs and expenses, including reasonable attorneys' fees, incurred by Bank or NP and arising out of any claim by cardholders whose security has been breached due to violation of Merchant of this Section. Merchant acknowledges that NP may pass on research fees of up to $75 per hour resulting from research of archived records that are the responsibility of the Merchant. Merchant further acknowledges that it is responsible for examining its monthly Merchant Statement for billing accuracy. NP reserves the right to limit billing error corrections and refunds to those occurring within the last ninety (90) days. Merchant further agrees that Bank or NP or their representatives may, during normal business hours, inspect, audit, and make copies of Merchant's books, accounts, records and files pertaining to any transactions, refunds or adjustments thereon.

12. Chargebacks. For purposes of this Agreement, "Chargeback" shall mean the procedure by which a sales draft or other indicia of a Transaction (or disputed portion thereof) is denied or returned to Bank or the issuing bank after it was entered into the appropriate settlement network for payment, in accordance with the Rules, for failing to comply with the Rules or due to a cardholder dispute, the liability of which is the Merchant's responsibility. As used in this Section 13, "Bank" refers to the Bank and/or NP (to the extent authorized by Bank and not prohibited by the Rules), unless the context indicates otherwise. Merchant understands and acknowledges that an authorized sale does not constitute a guarantee of payment, only available credit, and may be subject to dispute or chargeback. Notwithstanding any nonrecourse provisions contained herein, Merchant is responsible for any and all Chargebacks, as well as Card Brand fines, assessments and fees related to or arising out of such Chargebacks, and will pay Bank, upon demand and without notice, the face amount of any Chargeback, and Bank shall have the right, before or after the termination of this Agreement, to debit the Merchant's DDA, incoming transactions, or any other funds of the Merchant in Bank's direct or indirect control by reason of Bank's security interest granted by Merchant under Section 14 below, for the face amount of any Chargeback including without limitation and by way of example, in any of the following circumstances: (a) a mail order, e- commerce order, or telephone order Transaction is disputed by the cardholder; (b) merchandise has been returned or service canceled by cardholder and cardholder requested a credit from Merchant and such credit was not processed by Merchant; (c) the purchase had not been authorized as required or the denial of an Authorization was disregarded; (d) a Transaction is for a type of merchandise or services other than as described in the Application and the draft was charged back by the cardholder; (e) the cardholder contends or disputes to Bank, NP or the appropriate issuing bank that: (i) the goods or services were not received by the cardholder or their authorized user or (ii) the goods or services received by cardholder or their authorized user do not conform to what was on the sales draft or (iii) goods or services of value were defective or (iv) the dispute reflects a claim or defense authorized against card issuers or creditors by a relevant statute or regulation; (f) Merchant fails to honor a retrieval request from Bank or NP for an original sales draft in accordance with the requirements hereof; (g) a sales draft is illegible, incomplete or does not contain a Transaction date on the face or such dollar amount has been altered or incorrectly entered and sales draft has been charged back by the Card issuer; (h) the sales draft contains the imprinted or otherwise transcribed description of a Card other than the Card specified; (i) the transaction was generated through the use of an invalid, altered, counterfeit or expired Card; (j) no signature appears on the sales draft or sales draft does not contain the embossed legend from a Card or Merchant has failed to obtain the specific authorization from a designated Authorization Center to complete the Transaction and/or the cardholder has certified in writing, to Bank, NP or the issuing bank that he did not make or authorize the Transaction; (k) security procedures have not been followed or where the signature on the sales draft is different from the signature appearing on the signature panel of the Card and the sales slip is charged back; (l) a Card issuer, Bank or NP has information that Merchant fraud occurred at the time of the Transaction, whether or not such Transaction was authorized by the issuer and the cardholder neither participated in nor authorized the Transaction; (m) if with respect to any one Merchant outlet, the ratio of questionable Merchant activity to Card sales exceeds industry standards, in the sole determination of Bank or NP; or (n) the failure to utilize EMV capability where required. If, with respect to any one of Merchant's outlets, the amount of any Card counterfeit or fraud incidences becomes excessive, in the sole and absolute discretion of Bank or NP, Merchant may be charged back for all Transactions, terminated immediately for cause, and Merchant's funds, including but not limited to those incoming Transactions and in Merchant's DDA and Reserve Account shall be held pursuant to the provisions of this Agreement. Merchant agrees to accept and understands that it is responsible for all Chargebacks and understands that some Chargebacks cannot be rebutted or remedied. Merchant agrees to satisfy directly with the cardholder any claim or dispute arising from a Transaction. Bank and NP will provide Merchant with available information, if any, to assist Merchant in its response to any Chargeback. Bank and NP shall

retain any discount and/or other fee related to a Chargeback. Merchant understands that Bank and NP will assess a fee to process each Chargeback, or other charges that may be established by Bank and NP from time to time. Furthermore, Bank and NP may assess Merchant for any fines imposed by MasterCard, Visa, Discover and American Express plus a processing fee for such fine as may be required by Bank and NP at their sole discretion. Disputes relating to Chargebacks shall be governed by the Rules, including Merchant's obligation to provide required documentation. If the actual Card is "not present", Merchant also understands and acknowledges that Merchant bears one hundred percent (100%) of the risk of Chargeback under the Rules, for all Transactions and any fees resulting from any losses, claims, and costs arising from or associated with such all Transactions, including any Authorizations.

13. Returns and Credits. Merchant shall maintain a fair policy permitting refunds, exchanges, returns and adjustments in accordance with applicable law. If, with respect to any Transaction, any goods are accepted for return or any services are refunded, terminated or canceled, or any price adjustment is allowed by Merchant and except where otherwise required by law or governmental regulations, Merchant shall not under any circumstances, except as permitted by certain debit card networks, during the term of this Agreement, issue cash for return of goods or cancellations of service where goods or services were originally purchased in a Transaction. Instead, Merchant shall utilize a credit record evidencing such refund or adjustment. Merchant must process the credit record Transaction within three (3) business days of the original Transaction. Merchant shall date each credit record with the credit date and include thereon a brief description of the goods returned, services canceled or adjustment made and the amount of the credit, in sufficient detail to identify the Transaction. A completed copy of the credit record shall be delivered to the cardholder at the time of each return or cancellation of a transaction. The credit shall not exceed the amount of the original Transaction. The per Item Transaction Fee will be applicable and Merchant may not receive a refund of Discount Fees paid for the original Transaction. With proper disclosure at the time of the Transaction, Merchant may: (a) refuse to accept goods in return or exchange and refuse to issue a refund to a cardholder; (b) accept returned goods in exchange for the Merchant's promise to deliver goods or services of equal value available from Merchant at no additional cost to cardholder; or (c) stipulate special circumstances agreed to by the cardholder. Proper disclosure shall be deemed to have been given only if, at the time of the Transaction, the following notice appears on all copies of the sales draft in legible letters at least one-quarter (1/4) inch high and in close proximity to the space provided for the cardholder's signature stating "NO REFUND" or "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" or any special terms as applicable, or equivalent language, provided and to the extent such sales practices are permitted under applicable law.

14. Security Interest. Unless the context indicates otherwise, when used in this Section 15, "Bank" refers to the Bank and/or NP (to the extent authorized by Bank and not prohibited by the Rules). IN ORDER TO SECURE ALL OBLIGATIONS OF MERCHANT TO BANK AND NP ARISING FROM THIS AGREEMENT, MERCHANT HEREBY GRANTS BANK AND NP A CONTINUING SECURITY INTEREST IN AND TO ALL DEPOSITS, REGARDLESS OF SOURCE, TO MERCHANT'S DDA AND OTHER ACCOUNTS IN THE DIRECT OR INDIRECT CONTROL OF THE BANK (INCLUDING THE RESERVE ACCOUNT), ESTABLISHED IN MERCHANT'S NAME OR BY ANY PARTY SIGNING THE PERSONAL GUARANTY AS PART OF THIS AGREEMENT, AND TO ALL PROCEEDS OF SAID DEPOSITS. The grant of said security interest shall survive the termination of this Agreement. Said security interest may be set-off or otherwise exercised by Bank without notice or demand of any kind by making an immediate withdrawal from or holding said account, upon Bank's or NP's reasonable determination that a breach of any obligation of Merchant under this Agreement has occurred. The exercise of this security interest shall be in addition to any other rights of Bank and NP under this Agreement or applicable laws. The parties specifically acknowledge and affirm that pursuant to the Uniform Commercial Code, Bank has a general lien and right of offset upon all funds on deposit with Bank, which shall stand as one continuing collateral security for the timely performance by Merchant of all of its obligations to Bank and NP. Bank and NP shall also have the right to require Merchant to furnish such other and different security as Bank or NP shall deem appropriate in their sole discretion in order to secure Merchant's obligations under this Agreement. Merchant agrees to execute any documents or take any actions required in order to comply with and perfect any security interest under this Section, at Merchant's cost. To the extent permitted by law and the Rules, Merchant irrevocably authorizes Bank and NP to record any financing statement or other documents relating to this security interest. Merchant represents and warrants that no other person or entity has a security interest in the property described herein and that this security interest is a first lien security interest and secures Merchant's obligations to Bank under this Agreement. Merchant must obtain the prior written consent of Bank before granting any subsequent security interest in the property described herein.

15. Reserve Account. Unless the context indicates otherwise, when used in this Section 16, "Bank" refers to the Bank and/or NP (to the extent authorized by Bank and not prohibited by the Rules). In addition to the security interest and Chargeback rights granted to Bank and NP by Merchant, Merchant hereby authorizes Bank or NP to establish a non-interest bearing "Reserve Account", with or without notice to the Merchant, at any time prior to, at, or after the termination of this Agreement, when the Bank or NP have determined that any of the following has occurred: (a) reasonable doubt exists concerning Merchant's ability to comply with this Agreement; (b) Merchant's breach of this Agreement or other applicable Rules and regulations; (c) excessive Chargebacks, customer disputes, ACH rejects, retrieval requests or the reasonable possibility of any of the foregoing occurring; (d) inability of the Merchant to fund any potential Chargebacks, post termination fees, charges or other expenses and fees payable to the Bank or NP; (e) suspicious Transaction activity or Transaction activity which requires further research to verify or substantiate. The Reserve Account is not a bank account, but is an account payable to Merchant by Bank intended to cover Merchant obligations under this Agreement. Bank may elect to deposit all or a portion of the balance of the Reserve Account in a depository account or trust account at Bank, however, neither Merchant nor its creditors shall have any rights of withdrawal, pledge or assignment with respect to any such bank account. The Reserve Account may be funded, supplemented or replenished by the Bank in any or all of the following methods to the extent permitted by the Rules: (a) one or more debits to Merchant's DDA; (b) one or more deductions from payments due Merchant (including but not limited to regular deductions calculated as a percentage of net batch amounts); or (c) if Bank, NP and Merchant agree, delivery of letter of credit or certificate of deposit issued by a financial institution acceptable to Bank and NP. Merchant hereby agrees that Bank shall have a full right of offset with respect to the Reserve Account, and that Bank may deduct from this Reserve Account any amount owed to Bank or NP in accordance with this Agreement or any other agreement with Merchant. Any balance in the Reserve Account may be held until the expiration of any applicable Chargeback rights under applicable Rules of the Card Issuer, whose holding period may extend beyond the termination of this Agreement. Bank may fund, supplement, or replenish the Reserve Account in such an amount as Bank or NP may reasonably estimate is necessary to secure Merchant's payment, chargeback and other obligations under this Agreement. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Agreement, maintain sufficient balance in the Reserve Account in such amount as may be reasonably required by Bank or NP until all of the Chargeback rights of the Transactions processed preceding termination have expired. If, after all such Chargeback rights have expired, Bank and NP are unable to return the funds in the Reserve Account to Merchant after using reasonable efforts to contact Merchant, a fee of $95 per month shall be deducted from the Reserve Account in order to offset the administrative, clerical, legal, and risk management costs incurred by Bank and NP to monitor the funds remaining in the Reserve Account. Merchant hereby agrees that any financial institution at which Merchant maintains a deposit account may rely upon an executed copy of this Agreement provided by Bank as Merchant's express, written instruction and authorization to permit such offset by Bank, and Merchant's agreement that said financial institution shall be released from any liability for any good faith compliance with the express written instruction and authorization as set forth herein to permit such offset by Bank. (i) all of Merchant's business locations engage and will engage in the same or substantially similar business activity as that listed on the face of this Agreement; (j) the percentage of mail and/or telephone order sales listed by Merchant is and will be consistent at all of Merchant's locations; (k) Merchant does not and will not offer enticements or incentives to cardholders in connection with Transactions for the sale of Merchant products; (l) Merchant uses and will use both the name and address shown on the front of the Agreement on all sales drafts and does not and will not use any other name; (m) Merchant shall include all items of goods and services purchased in a single Transaction in the total amount on a single sales draft or transaction record (i.e., Merchant shall not "split tickets") and shall not submit duplicates of any transaction; (n) Merchant will process no Transaction between a cardholder and an entity other than Merchant; (o) Merchant shall be responsible for its employees' and agents' actions whether or not authorized by Merchant; (p) Merchant will not submit, and hereby acknowledges that Bank and NP will not knowingly accept, any Transaction that Merchant knows or should have known to be illegal, fraudulent or not authorized by the cardholder, or authorized by the cardholder colluding with the Merchant for a fraudulent purpose; (q) in the event Merchant was undergoing a forensic investigation at the time this Agreement was signed, Merchant fully cooperate with the investigation until it was completed; (r) Merchant certifies that it has provided Bank and NP its correct federal tax identification number; is not subject to backup withholding; and is a U.S. citizen or other U.S. person; (s) except as disclosed to Bank and NP in writing, within the preceding 10 years neither Merchant, nor its Guarantor(s) or owner(s) identified on the Application has been (i) convicted of a felony, (ii) placed in any Card Brand compliance monitoring program, (iii) the subject of, or a related party in, any complaint or investigation with the National Automated Clearing House Association (NACHA), (iv) placed on the Terminated Merchant File (MATCH) or Office of Foreign Assets Control (OFAC) lists, or (v) the subject of an adverse judgment relating to consumer protection laws or regulations; and (t) Merchant owns a manual imprinter and will provide imprinted sales drafts whenever necessary. Merchant further warrants and agrees that it shall not, without the cardholder's consent and as permitted by law and the Rules, sell, purchase, provide, or exchange card account information in the form of sales drafts, mailing lists, tapes, or any other media obtained by reason of a Transaction or otherwise, to any third party other than to Merchant's agents approved by Bank and NP for the purpose of assisting Merchant in its business, to Bank, NP, or the respective card issuer or Card Brand or pursuant to lawful government demand. All media containing card account numbers must be stored in an area limited to selected personnel until discarding and must be destroyed in a manner that will render the data unreadable. Merchant will not disclose and will keep confidential the terms and conditions of this Agreement. If Merchant processes and stores Card data and/or has access to that information via the internet, Merchant agrees to comply with all Rules in respect of protecting Card data and maintaining security measures, including the PCI Council DSS. Failure to comply with the Rules or foregoing requirements, the occurrence of any significant circumstance that may create harm or loss of goodwill to any Card Brand, and/or any security breach compromising Card data shall make the Merchant liable for any network fines, fees and/or unauthorized charges to compromised Card accounts, and may result in immediate termination. Merchant understands and agrees that violation of any of the foregoing warranties, representations, covenants and agreements or otherwise provided in this Agreement shall constitute an event of default and breach by Merchant of this Agreement, and may cause this Agreement to be immediately terminated, including Merchant's participation in the American Express OptBlue program, or be subject to termination, and may result in all funds being placed in a Reserve Account pursuant to Section 16 hereof

16. Warranties by Merchant. Merchant represents and warrants to Bank and NP that all statements on provisions of this Agreement. the Application are true, and that Merchant will promptly inform Bank and NP in writing of any statements on the Application that cease to be true. Merchant also represents and warrants to Bank and NP that it has taken all necessary action and has the authority to enter into this Agreement with Bank and NP and that the person(s) signing for or on behalf of Merchant is (are) specifically authorized and directed to do so by Merchant. This Agreement constitutes the legal, valid and binding obligation of Merchant, enforceable against Merchant in accordance with its terms. Without limiting any other representations, warranties, covenants and agreements hereunder, Merchant agrees, represents and warrants to Bank and NP that at all times during the term of this Agreement: (a) Merchant is engaged and will engage in the lawful business shown on the front of the Application and is duly licensed under the laws of the State, County and City in which Merchant is located to conduct such business, and in conducting such business will not engage in unfair, deceptive, or abusive practices; (b) Merchant currently accepts or desires to accept Cards for the purchase of goods and services through Transactions with cardholders; (c) Merchant has not been terminated from the settlement of card transactions by any financial institution or determined to be in violation of the rules and regulations of Bank, NP, MasterCard, Visa, American Express or any other Card Brand or network; (d) Merchant does and will fully comply with all federal, state, and local laws, rules and regulations, as amended from time to time, including all laws with respect to consumer protection and credit, including, without limitation, the Consumer Financial Protection Act and any regulations issued by the Consumer Financial Protection Bureau, and the Rules; (e) Merchant is aware that Visa, MasterCard, Discover, American Express and other Card Brands maintain and publish various guides and best practices policies with respect to risk management, cardholder data security, chargeback management, fraud prevention, and dispute resolution and will familiarize itself with those materials and any amendments to them, and will accept Cards in accordance with the terms of this Agreement and the operating and other rules and regulations of the Card Brands including without limitation the American Express Merchant Operating Guide as such terms may be amended from time to time; (f) except to the extent inconsistent with specific provisions of this Agreement, Merchant also will comply with any and all best practices guidelines provided by NP; (g) Merchant will provide Bank and NP sixty (60) days prior written notice of its intent to (i) transfer or sell 10% or more of its total stock, assets and/or liquidate, (ii) change the nature of its business, or (iii)convert all or part of its retail sales to mail, e-commerce, or telephone orders or any other sales method in which the Card is not present and swiped through the POS terminal;(h) as to each Transaction presented to Bank and NP for payment: (i) the sales draft is and willbe valid in form and has been completed in accordance with the Rules, all applicable laws and requirements, (ii) Merchant has delivered goods to the Cardholder or completed the service described on the sales draft in accordance with Merchant's agreement with the Cardholder, (iii) each sales draft represents a bona fide Transaction directly between the Merchant and the cardholder in the Merchant's ordinary course of business and the sales draft shows the cardholder's indebtedness for the total amount shown, (iv) the cardholder has no claim, defense, right of offset, or dispute against Merchant in connection with the purchase of the goods or service and Merchant will provide adequate services to cardholders and will honor all warranties applicable thereto, (v) Merchant has not charged cardholder any separate or additional fee(s) in connection with the Transaction other than as may be required by law or permitted by the Rules (the foregoing shall not prohibit Merchant from extending discounts to customers paying by cash, check, or any other means, other than by Card), and

(vi) each Transaction was and will be placed by a person who is the cardholder or authorized user of the Card; (i) all of Merchant's business locations engage and will engage in the same or substantially similar business activity as that listed on the face of this Agreement; (j) the percentage of mail and/or telephone order sales listed by Merchant is and will be consistent at all of Merchant's locations; (k) Merchant does not and will not offer enticements or incentives to cardholders in connection with Transactions for the sale of Merchant products; (l) Merchant uses and will use both the name and address shown on the front of the Agreement on all sales drafts and does not and will not use any other name; (m) Merchant shall include all items of goods and services purchased in a single Transaction in the total amount on a single sales draft or transaction record (i.e., Merchant shall not "split tickets") and shall not submit duplicates of any transaction; (n) Merchant will process no Transaction between a cardholder and an entity other than Merchant; (o) Merchant shall be responsible for its employees' and agents' actions whether or not authorized by Merchant; (p) Merchant will not submit, and hereby acknowledges that Bank and NP will not knowingly accept, any Transaction that Merchant knows or should have known to be illegal, fraudulent or not authorized by the cardholder, or authorized by the cardholder colluding with the Merchant for a fraudulent purpose; (q) in the event Merchant was undergoing a forensic investigation at the time this Agreement was signed, Merchant fully cooperate with the investigation until it was completed; (r) Merchant certifies that it has provided Bank and NP its correct federal tax identification number; is not subject to backup withholding; and is a U.S. citizen or other U.S. person; (s) except as disclosed to Bank and NP in writing, within the preceding 10 years neither Merchant, nor its Guarantor(s) or owner(s) identified on the Application has been (i) convicted of a felony, (ii) placed in any Card Brand compliance monitoring program, (iii) the subject of, or a related party in, any complaint or investigation with the National Automated Clearing House Association (NACHA), (iv) placed on the Terminated Merchant File (MATCH) or Office of Foreign Assets Control (OFAC) lists, or (v) the subject of an adverse judgment relating to consumer protection laws or regulations; and (t) Merchant owns a manual imprinter and will provide imprinted sales drafts whenever necessary. Merchant further warrants and agrees that it shall not, without the cardholder's consent and as permitted by law and the Rules, sell, purchase, provide, or exchange card account information in the form of sales drafts, mailing lists, tapes, or any other media obtained by reason of a Transaction or otherwise, to any third party other than to Merchant's agents approved by Bank and NP for the purpose of assisting Merchant in its business, to Bank, NP, or the respective card issuer or Card Brand or pursuant to lawful government demand. All media containing card account numbers must be stored in an area limited to selected personnel until discarding and must be destroyed in a manner that will render the data unreadable. Merchant will not disclose and will keep confidential the terms and conditions of this Agreement. If Merchant processes and stores Card data and/or has access to that information via the internet, Merchant agrees to comply with all Rules in respect of protecting Card data and maintaining security measures, including the PCI Council DSS. Failure to comply with the Rules or foregoing requirements, the occurrence of any significant circumstance that may create harm or loss of goodwill to any Card Brand, and/or any security breach compromising Card data shall make the Merchant liable for any network fines, fees and/or unauthorized charges to compromised Card accounts and may result in immediate termination. Merchant understands and agrees that violation of any of the foregoing warranties, representations, covenants and agreements or otherwise provided in this Agreement shall constitute an event of default and breach by Merchant of this Agreement, and may cause this Agreement to be immediately terminated, including Merchant's participation in the American Express OptBlue program, or be subject to termination, and may result in all funds being placed in a Reserve Account pursuant to Section 16 hereof.

17. Term. The term of this Agreement shall be twenty four (24) months commencing on the acceptance of the Application and this Agreement by Bank and NP and the issuance of a merchant account identification number to Merchant identifying Merchant for accounting, billing, customer service and related purposes in connection with the Services. Thereafter, the Term shall automatically renew for additional consecutive twenty four (24) month terms, unless written notice of termination (to be effective upon the expiration of the then current term) is provided by Merchant to Bank and NP or by Bank and NP to Merchant at least ninety (90) days prior to the then existing term, unless earlier terminated in accordance with the provisions of this Agreement.

18. Termination and Events of Default: This Agreement may be terminated and/or operation of this Agreement suspended upon the giving of notice by Bank and/or NP in the manner prescribed for notices herein. Such termination and/or suspension of operation shall be effective immediately or at any later date that is specified in the notice. Such termination and/or suspension of operation may be for any breach by Merchant of this Agreement or for any other reason, including but not limited to: (a) Bank and/or NP determines that Merchant's type of business as indicated on the Application differs from the actual type of business Merchant operates; (b) Merchant moves or relocates to a new location without giving Bank and NP at least thirty (30) days prior written notice; (c) the business as conducted by Merchant could endanger the safety and/or soundness of Bank or NP; (d) the Merchant's owner, officer or corporate entity has a separate relationship with Bank and/or NP and such relationship has been terminated by Bank and/or NP; (e) Merchant and/or any of its guarantors files for bankruptcy or is otherwise shown to be insolvent; (f) Merchant has excessive Chargebacks and or returns and credit transactions, in the sole discretion of NP and/or Bank; (g) Merchant owes money to Bank and/or NP or any of their respective affiliates, and fails to make a timely payment thereof; (h) Merchant has breached or is in default under an End-User Agreement or similar agreement regarding the provision of web hosting, e-mail, electronic commerce, domain name and/or other internet application or system services; (i) Merchant fails to notify Bank and NP if it knows or suspects that cardholder personal information has been compromised; (j) NP and / or Bank is otherwise not secure (as determined by NP and / or Bank, in its sole and absolute discretion) with respect to Merchant's financial position; (k) the continued provision of services to Merchant would pose a level of risk and/or exposure to NP or Bank (including, without limitation, credit, operational, reputational, financial, technological, security and/or fraud risk or exposure) that Bank or NP considers, in its sole discretion, to be unacceptable; or (l) the Rules require that NP and/or Bank terminate and/or suspend this Agreement. Bank and/or NP in their sole discretion also may terminate and/or suspend operations, as described above, of any merchant processing agreement(s) of any other business that is commonly owned with or controlled by Merchant. In addition, Merchant hereby acknowledges that the Card Brands have the right to terminate or limit this Agreement. In the event of termination by Bank or NP due to breach by Merchant of any of the terms and conditions of this Agreement, Merchant shall pay to NP the early termination fee disclosed in the Schedule of Fees. Upon the occurrence of an event of default or the termination of this Agreement by Bank or NP in accordance with the terms hereof, Bank and NP shall be entitled to pursue all rights and remedies available to it or them under this Agreement, at law or in equity, including but not limited to placing the Merchant in the "Terminated Merchant File" and collection of the early termination fee. All obligations of confidentiality and of any party to this Agreement to pay funds to another shall survive any termination hereof. Nothing herein shall be construed as relieving Merchant of the obligation for the Minimum Discount Fee as provided in Schedule of Fees for the term of this Agreement. Bank and NP shall be entitled to pursue all rights and remedies available to it or them under this Agreement, at law or in equity, including but not limited to placing the Merchant in the "Terminated Merchant File" and collection of the early termination fee. All obligations of confidentiality and of any party to this Agreement to pay funds to another shall survive any termination hereof. Nothing herein shall be construed as relieving Merchant of the obligation for the Minimum Discount Fee as provided in Schedule of Fees for the term of this Agreement.

19. Indemnification; Bank and NP Liability. Merchant agrees to indemnify and hold Bank and NP harmless from and against any Card Brand fines, assessments, or fees, and all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) arising out of or related to: (i) the services provided hereunder; (ii) breach of any warranty, covenant, agreement, term or condition of this Agreement, applicable law, or the Rules by Merchant, its employees, agents or third party servicers; (iii) any action by Bank or NP to collect sums due from Merchant under the Agreement; (iv) any act or omission of, or misrepresentation by Merchant, its employees, agents, third party servicers or other third parties with which Merchant has contracted; (v) Merchant's processing activities and provision of goods and services to cardholders; (vi) the negligence, willful misconduct, fraud or dishonesty of Merchant or Merchant's employees, licensees, successors, agents and/or assigns; and (vii) services provided directly or indirectly to or on behalf of Merchant by third parties, including without limitation Merchant's internet service provider or other telecommunication services provider, and any third party services provided through or resold by NP, including but not limited to electronic authorization and settlement services, web site hosting services, electronic payment gateway services, POS systems, software, and equipment, and gift card or customer loyalty program services providers. Merchant agrees that Bank is not responsible for and has no liability in connection with the Non-Bank Services and Merchant agrees to indemnify and hold Bank harmless from and against any and all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) arising out of or related to the Non-Bank Services. Except as expressly provided in this Agreement, Bank and NP make no warranties whether express, implied or statutory, in connection with this Agreement. Without limiting the foregoing, BANK AND NP DISCLAIM ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Bank or NP may utilize systems of others (including, but not limited to systems of any Card Brands, payment gateway services, or systems related to Non-Bank Services), in connection with its performances of the services described hereunder. Bank and NP shall not be responsible or liable for any negligence or wrongdoing of such third parties, or any information provided by others or for the use of any system or equipment of Bank and NP or others or for any circumstances beyond its control. Merchant hereby covenants that it will not sue, or assert any claims in any tribunal or arbitration against Bank or NP for any harm, costs, losses, damages, declaratory relief, injunctive relief, or other relief arising from or relating to any actions or omissions by any third party including without limitation Merchant's internet service provider or other telecommunication services provider, and any third party services provided through or resold by NP, including but not limited to electronic authorization and settlement services, web site hosting services, electronic payment gateway services, POS systems, software, and equipment, and gift card or customer loyalty program services providers. The sole and exclusive liability of Bank and NP and remedy of Merchant hereunder (including negligence) shall be general money damages not to exceed the amount of the item subject to claim or dispute, regardless of the characterization of such action. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL BANK AND NP, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY, FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR ATTORNEYS FEES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Neither Bank nor NP shall be responsible or liable for any action taken by Bank or NP (or the results thereof) that is authorized by this Agreement, the Rules, or applicable regulations or law. Neither Bank nor NP shall have liability for any taxes arising under this Agreement (which liability will be that of Merchant), other than taxes based on Bank's or NP's income. Merchant acknowledges that Bank is directly involved in the administration of Merchant's Visa and Master Card Transactions (as a result of Bank's membership in those Card Brand associations), but Bank has no similar relationship with respect to its Discover Transactions or American Express Transactions. Merchant's relationship with those Card Brands is established (directly or indirectly) through NP.

20. Force Majeure. The parties to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith, or governmental proclamation, regulation, or priority, or any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

21. Notices. Any notice, request, instruction or other document directed to Merchant required or permitted under this Agreement shall be deemed to have been given: (a) upon receipt if by (i) personal delivery or (ii) overnight courier service by way of a national courier; (b) upon transmission if by (i) e-mail to the address provided by Merchant on this Agreement or the last address provided to NP by Merchant, or (ii) fax to the fax number provided by Merchant on this Agreement or the last fax number provided to NP by Merchant; or (c) on the third day after the same shall be sent by first class mail, postage prepaid, to the address provided by Merchant on this Agreement or at such other address as Merchant may give to the Bank or NP from time to time by written notice. Merchant agrees to carefully and promptly review each monthly statement and other notices or materials accompanying the statement because notices (including those referring to detailed amendments or changes posted online) may be included on and with such statement. Any notice, request, instruction or other document directed to Bank or NP required or permitted under this Agreement shall be deemed to have been given on the third day after the same shall be sent by first class mail, postage prepaid, to NP at 472 W 800 N., Suite 101, Orem, UT 84057 and to Chesapeake Bank at 97 N. Main Street, Kilmarnock, VA 22482, or to Avidia Bank at 42 Main Street, Hudson, MA 01749, or at such other addresses as NP or Bank may give to the Merchant from time to time by written notice.

22. Severability. If any part of this Agreement is held unenforceable or invalid or prohibited by law, said part shall be deemed stricken therefrom and this Agreement shall be read and interpreted as though said part did not exist, and shall not affect the validity or enforcement of any other provision.

23. Waiver. Neither the failure nor any delay on the part of Bank or NP to exercise any right, remedy, power or privilege hereunder shall operate as a waiver nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then such waiver shall apply only to the extent specifically stated in such writing.

24. Entire Agreement. This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between the Merchant, Bank and NP with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, NP or its sales representative, whether expressed or implied, oral or written. This Agreement is not effective and may not be modified in any respect without the approval of Bank. Merchant and Guarantor(s) acknowledge and agree that this Agreement is made as part of a transaction solely for business and commercial purposes and is not primarily for personal, family, or household purposes.

25. Assignment and Delegation. This Agreement may be assigned by Bank. NP may subcontract, sublicense, assign, license, franchise, or in any manner extend or transfer to any third party any right or obligation of NP set forth herein but only as may be approved by Bank and permitted under the Rules. This

national processing

MERCHANT APPLICATION / AGREEMENT

Agreement may not be assigned by Merchant without Bank's and NP's prior written consents and any purported assignment without such consents shall be void. This Agreement shall be binding on the parties and their permitted heirs, successors, and assigns. Bank (and NP, if and to the extent permitted under the Rules) reserves the right, in its sole discretion, to delegate or assign to third parties the performance of certain of Bank's (or NP's, if applicable) servicing or settlement obligations to Merchant. The relationship of Bank, NP and Merchant is solely that of independent parties contracting for services

26. Disputes, Governing Law, Jurisdiction, and Venue. This Agreement shall be governed by and construed in accordance with the laws of the Utah. In the event Merchant fails to pay Bank and/or NP Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant (and guarantor(s) of Merchant's obligations and duties hereunder) agree that Bank and/or NP can sue Merchant (and any guarantors) in court. In the case of any such lawsuit, personal jurisdiction and exclusive venue shall lie in the federal or state courts of Utah County, Utah and Merchant (and any guarantor) hereby waives all objections to said jurisdiction. If in response to any lawsuit seeking to recover Chargebacks, fees, settlement costs or other amounts due hereunder Merchant (or its guarantors) asserts a counterclaim, cross claim and/or a third-party complaint against NP or Bank, then the claims and defenses of NP and/or the Bank and the claims and defenses of Merchant (and any guarantors) shall be subject to arbitration as set forth in Section 27, unless waived. The parties agree that no affirmative defense or request for setoff asserted by Merchant (and any guarantors) in response to the complaint filed by Bank or NP under this Section 26 shall exceed the amount sought by or awarded to Bank or NP in the lawsuit. The parties hereby waive any right to trial by jury in connection with any dispute between them. Any claims concerning errors in the Fees charged hereunder must be made in writing within six months of the occurrence of the error on which the claim is based, and must specify the grounds for the claim. No claim relating to Fees charged hereunder may be brought until thirty days after written notice is provided. Merchant acknowledges and agrees that, in addition to clearing and settling Transactions, Bank collects fees, costs, and other charges due from Merchant under this Agreement at NP's instruction. Merchant agrees that Bank has no duty to verify, audit, review or otherwise oversee the fees, costs, or other charges that Bank collects from Merchant.

27. Arbitration. Except as expressly provided in Section 26 any claim or dispute arising out of or related to this Agreement shall be finally resolved by final and binding arbitration. Whenever a party shall decide to institute arbitration proceedings, it shall give written notice to that effect to the other parties. The party giving such notice shall refrain from instituting the arbitration proceedings for a period of thirty (30) days following such notice to allow the parties to attempt to resolve the dispute between or among themselves. If the parties are still unable to resolve the dispute, the party giving notice may institute the arbitration proceeding under the rules of the American Arbitration Association ("AAA Rules"). Arbitration shall be on an individual basis only. There shall be no right or authority for any claims or disputes to be arbitrated on a class action or consolidated basis, or in a representative or private attorney general capacity. Arbitration shall exclusively and solely be held in Utah County, Utah. The arbitration shall be conducted before a single arbitrator mutually chosen by the parties, but if the parties have not agreed upon a single arbitrator within fifteen (15) days after notice of the institution of the arbitration proceeding, then the arbitration shall be conducted by a panel of three (3) arbitrators. In such case, Merchant, on the one hand, and Bank and/or NP on the other, shall within thirty (30) days after notice of the institution of the arbitration proceedings appoint one arbitrator. The presiding arbitrator shall then be appointed in accordance with AAA Rules. Decisions of the arbitrator(s) shall be final and binding on the parties. The arbitrator shall have the authority to award any remedy or relief a Utah court could order or grant, including, without limitation, specific performance of any obligation created under this Agreement, the awarding of the issuance of an injunction or the imposition of sanctions for abuse or frustration of the arbitration process. Judgment upon the award of the arbitrator may be entered in any court of competent jurisdiction and enforced with full judicial effect thereafter. All fees and expenses of the arbitration shall be borne by the parties equally and each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentations, provided, however, that the arbitrator(s) is/are authorized to award any party such sums as shall be deemed proper for the time, expense and inconvenience of arbitration, including arbitration fees and expenses and attorneys' fees and expenses. Except to the extent that entry of judgment and any subsequent enforcement may require disclosure, all matters relating to the arbitration, including the award, shall be held in confidence by the parties.

28. Compliance and Disclosure of Information; Patriot Act. Merchant shall promptly provide such information and certifications as Bank and NP may reasonably require from time to time in reviewing Merchant's compliance with the terms and conditions of this Agreement and the Rules, and all such information shall be true and complete. Merchant further agrees to produce and make available for inspection by Bank, NP or its officers, agents or representatives, such books and records of Merchant as Bank or NP may deem reasonably necessary to be adequately informed of the business practices and financial condition of Merchant, or the ability of Merchant to observe or perform its obligations to Bank and NP pursuant to this Agreement. Merchant further agrees to provide to Bank or NP within seven (7) days of notice such information as Bank or NP may request including but not limited to, credit reports, personal and/or business financial statements, income tax returns, or other such information as Bank or NP may request. Merchant grants to Bank and NP continuing authority to conduct credit checks and background investigation and inquiries concerning Merchant and its owner(s) including, but not limited to, character and business references and the financial condition of Merchant and Merchant's owner(s). Merchant expressly authorizes Bank, NP or its agents and representatives to provide and receive such information from any and all third parties directly, without further consent or authorization on the part of Merchant. Bank and NP may share with others its credit, sales and other information. Merchant will not transfer, sell, or merge or liquidate its business or assets or otherwise transfer control of its business, change its ownership in any amount or respect, engage in any joint venture partnership or similar business arrangement, change its basic nature or method of business, types of products sold or engage in sales by phone, internet, or mail order without providing notice to Bank or NP and providing Bank or NP with the opportunity to terminate this Agreement. Merchant acknowledges that Bank has implemented a customer identification program as required under the USA Patriot Act and other similar state laws and regulations. Merchant agrees to make available to Bank and/or NP such information as may be required by Bank in connection with its customer identification program and/or as required under the USA Patriot Act and related state laws and regulations. Merchant hereby expressly consents to disclosure by NP of Transaction data, Merchant data, and other information about the Merchant to American Express, and, further, expressly consents to American Express' use of such information to perform its responsibilities in connection with its Card program, promote the American Express network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes and important transactional or relationship communications from American Express. American Express may use the information obtained in this application at the time of setup to screen and/or monitor Merchant in connection with Card marketing and administrative purposes.

29. Amendments. This Agreement may not be modified in any respect without the approval of the Bank. This Agreement may be amended by Bank and NP from time to time upon written notice. Any amendment to the fees and rates set forth in the Schedule of Fees, including any additional fees, shall be effective on 30 days written notice. Any other amendment to this Agreement shall be effective on the effective date specified in the notice unless otherwise provided for herein. In the event of any amendment of the terms and conditions of this Agreement or of the fees payable to Bank or NP hereunder, Merchant shall have the right to terminate this Agreement without the payment of the termination fee provided in Section 18 above by providing Bank and NP written notice of such termination within 30 days after Merchant received notice of the amendment, except as otherwise required by the Rules. No such termination shall effect any obligation of Merchant to pay any fees, charges, or other obligations incurred by Merchant under this Agreement prior to the date of termination.To the extent not inconsistent with the foregoing, Merchant's submission of transactions to Bank and NP on or after any amendment effective date constitutes acceptance of such amendment. Any alteration or modification to the preprinted form of this Agreement has no effect and, at the Bank and NP's discretion, may render this Agreement void.

30. Privacy. NP's Privacy Policy is posted online at www.nationalprocessing.com/privacy-policy. Merchant acknowledges that it has read, understood, and hereby accepts the Privacy Policy. CALIFORNIA RESIDENTS: NP COLLECTS PERSONAL INFORMATION IDENTIFIERS, CUSTOMER RECORDS, COMMERCIAL INFORMATION, INTERNET/ELECTRONIC ACTIVITY, AND PROFESSIONAL/EMPLOYMENT INFORMATION TO DECIDE IF AND HOW NP WILL PROVIDE SERVICES, AUDIT PERFORMANCE, DETECT SECURITY ISSUES, AND PROVIDE CUSTOMER SERVICE (SUCH AS MAINTENANCE AND REPAIRS OF SYSTNP AND RESEARCH) ALL AS DESCRIBED IN OUR PRIVACY POLICY AT WWW.NATIONALPROCESSING.COM/PRIVACY-POLICY. NP SHARES SOME OF THIS INFORMATION TO PROVIDE SERVICE, TO COMPLY WITH BANK AND CARD BRAND REGULATIONS, AND STATE AND FEDERAL LAW, AND FOR OTHER COMMERCIAL PURPOSES. This Agreement limits no rights under the California Consumer Privacy Act.

31. Survival. Any and all provisions of this Agreement that impose or could be construed to impose a continuing obligation, duty, or requirement upon Merchant, including but not limited to Merchant representations, warranties, covenants, indemnification for chargebacks, returns and reversals, duties of account maintenance, limitations of liability, governing law and venue shall survive the expiration or termination of this Agreement for any reason.

32. Construction. The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or otherwise define the scope of this Agreement.

33. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterparts to constitute but one and the same instrument.

34. Agent. In its performance of the Services, NP is acting solely on behalf of Bank as its agent, and is subject to Bank's oversight pursuant to the Rules. Bank is responsible for providing settlement funds directly to Merchant hereunder based upon instructions given by NP or NP's service provider, and (a) NP may not have access to any Transaction funds or Reserve Account funds due to Merchant, and (b) no obligation to pay Merchant related to the Services may be delegated to, or assumed by NP.

35. Default Interest Rate. Merchant agrees that all amounts due and payable by Merchant to Bank or NP under this Agreement shall accrue interest at the rate of one and one-half percent (1.50%) per month, or the maximum interest rate permissible under law, whichever is lesser, beginning as of date due and continuing following any judgment obtained by Bank or NP against Merchant until paid in full.

36. Financial Accommodation. The acquisition, processing and settlement of Transactions is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Agreement cannot be assigned or enforced and Bank and NP shall be excused from performance hereunder.

37. Covenants applicable to American Express acceptance. This Section 37 shall govern Merchant's participation in the American Express OptBlue Card Acceptance Program ("Program"). All capitalized terms set forth in this Section 37 that are not defined in this Agreement shall be given the definition assigned by American Express. For purposes of clarity, any conflict between the defined terms of this Agreement, including those found in this Section 37, and those terms defined by American Express, the definition provided by American Express shall control. The provisions of the American Express Merchant Operating Guide, as may be amended from time to time, are incorporated herein by reference and made a part hereof (see http://www.americanexpress. com/merchantopguide). Merchant hereby expressly authorizes NP to submit Transactions to, and receive settlement from, American Express on behalf of the Merchant. Merchant agrees that NP may collect and disclose Transaction Data, Merchant Data, and other information about Merchant to American Express, and American Express may use such information to perform its responsibilities in connection with the Program, promote the American Express Network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes within the parameters of this Agreement, and important transactional or relationship communications from American Express. Merchant agrees that American Express may use the information obtained in the Merchant application at the time of setup to screen and/or monitor Merchant in connection with Card marketing and administrative purposes. American Express is hereby conferred third-party beneficiary rights, but not obligations, to this Agreement that will fully provide American Express with the ability to enforce the terms of this Agreement against the Merchant. Merchant may, at any time, opt out of accepting American Express Cards without penalty and without directly or indirectly affecting its rights to accept Other Payment Products. Merchant acknowledges that it may be converted from the Program to a direct Card acceptance relationship with American Express if and when it becomes a High CV Merchant in accordance with the Rules and expressly agrees that upon conversion,(i) the Merchant will be bound by American Express' then-current Card Acceptance Agreement; (ii) American Express will set pricing and other fees payable by the Merchant for American Express Card acceptance; and (iii) Authorization or other Transaction Fees may still be payable to NP pursuant to the Schedule of Fees in this Agreement, provided such is not prohibited by American Express. Merchant may not bill or collect from any Cardmember for any purchase or payment on the American Express Card unless Chargeback has been exercised, the Merchant has fully paid for such Charge, and it otherwise has the right to do so. Merchant's refund policies for purchases on the American Express Card must be at least as favorable as its refund policy for purchase on any Other Payment Products and the refund policy be disclosed to Cardmembers at the time of purchase and in compliance with Applicable Law. Merchant must ensure data quality and that Transaction Data and customer information is processed promptly, accurately and completely and complies with American Express Technical Specifications. The foregoing also applies to any third parties Merchant enlists to facilitate Transaction processing; valid and accurate data must be provided for all data elements in accordance with the American Express Technical Specifications. Merchant shall not assign to any third party any payment due to it under the Program, and all indebtedness arising from Charges will be from bona fide sales of goods and services (or both) at its Establishments and free of liens, claims, and encumbrances other than ordinary sales taxes; provided, however, Merchant may sell and assign future Transaction receivables to NP or Bank, any affiliated entities of NP or Bank, and/or any other cash advance funding source that partners with NP or Bank or its affiliated entities, without consent from American Express. Merchant is responsible for being aware of and adhering to privacy and data protection laws and provide specific and adequate disclosures to American Express Cardmembers of collection, use, and processing of personal data. Merchant must report all instances of a Data Incident immediately to Bank or NP after discovery of the incident. Merchant's participation in the American Express OptBlue program may be immediately terminated by Bank or NP for cause or fraudulent or other activity, or upon American Express' request. Bank or NP may terminate Merchant's right to accept American Express Cards if

national processing

MERCHANT APPLICATION / AGREEMENT

Merchant breaches any provision of the American Express Merchant Operating Guide or any terms of this Section 37. Upon termination of this Agreement or Merchant's participation in the Program, Merchant will cease all use of, and remove American Express Licensed Marks from Merchant's website or wherever else they are displayed. Merchant must comply with the American Express Data Security Requirements (DSR) and Payment Card Industry Data Security Standard (PCI DSS). Merchant must comply with all Applicable Laws, rules, and regulations relating to the conduct of Merchant's business.

38. This Agreement shall be effective only upon(i) acceptance and/or signature by NP, and (ii) the approval of Bank. Merchant's submission of transactions under this Agreement shall constitute Merchant's acknowledgment of acceptance of this Agreement by Bank and NP. Any application fee paid to Bank or NP is nonrefundable whether or not Merchant and this Agreement are accepted by Bank and NP.

Merchant Name (Print) Mm Production Enterprises, LLC

By: Michal Skarzynski (Jul 27, 2024 20:08 EDT) Jul 27, 2024

Authorized Signature Date

michal skarzynski

Authorized Signer's Name (Print)

Its: owner

Michal Skarzynski (Jul 27, 2024 20:08 EDT) Jul 27, 2024

Guarantor Date

Guarantor Date

national processing

MERCHANT APPLICATION / AGREEMENT

## DEALS WITHOUT TERMINALS

Complete only if no terminal is being shipped. Please send separate order form (on NPU) if NP needs to ship a terminal.

☐ NP Install/Deployment ☐ Send Welcome Kit ______________________
Terminal Type

DATE: ________ NP ISSUED OFFICE NUMBER: ______________________

MERCHANT DBA: solutionpeptides.net

SALES REP: ______________________

MERCHANT EMAIL: admin@solutionpeptides.net

Required on All Deals

## REQUIRED DOCUMENTATION *(RETAIL ONLY)*

| | | |
|---|---|---|
| ☐ Merchant Application | ☐ Drivers License | ☐ Voided Check |
| ☐ 3 Most Recent Processing Statements | ☐ Inside Photo Showing Inventory | ☐ W9 |
| ☐ Disclosure Page | ☐ Outside Photo Showing Signage | |

| TERMINAL INFORMATION | PAYMENT GATEWAY INFORMATION | SOFTWARE INFORMATION |
|---|---|---|
| ☐ Terminal Type: ________<br>Number of Terminals: ________<br>☐ IP ☐ Dial Up<br><br>☐ Debit<br>☐ Internal Debit<br>☐ External, Pin Pad Model<br><br>☐ EBT (FNF #) ________ | ☐ Gateway Name: NMI.com<br>☐ NP Billing the merchant (require fees on e-commerce line of the merchant agreement)<br>☐ Agent / 3rd Party / Existing Gateway (NP only builds a VAR sheet)<br>☐ With Swiper<br>Model: ________ | ☐ Software Information: ________<br>☐ Software Version: ________<br>☐ VAR Contact Info: ________<br>________<br>________<br>☐ How Many Lanes: ________<br>Note: Merchant is responsible for reprogramming which may require cost from the VAR. |

## REQUIRED PREVIOUS PROCESSING INFORMATION (SQUARE / STRIPE / PAYPAL / ETC.)

☐ Website / Processor: ______________________

☐ Login Name: ______________________ ☐ Password: ______________________

# National_Processing_App

Final Audit Report 2024-07-28

| | |
|---|---|
| Created: | 2024-07-27 |
| By: | High Wire Enterprises LLC (esign-highwire@iriscrm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAIImjur2qiAKAgTYKobYC81U9co0hwQr- |

## "National_Processing_App" History

Document created by High Wire Enterprises LLC (esign-highwire@iriscrm.com)
2024-07-27 - 11:53:48 PM GMT

Waiting for Signature by admin@solutionpeptides.net
2024-07-27 - 11:53:53 PM GMT

Signer admin@solutionpeptides.net entered name at signing as Michal Skarzynski
2024-07-28 - 0:08:06 AM GMT

Document e-signed by Michal Skarzynski (admin@solutionpeptides.net)
E-signature hosted by High Wire Enterprises LLC (esign-highwire@iriscrm.com)
Signature Date: 2024-07-28 - 0:08:08 AM GMT - Time Source: server

Agreement completed.
2024-07-28 - 0:08:08 AM GMT